UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THOMAS B. WILINSKY, Trustee of the JENNIFER WYNNE REEVES TRUST, STEVE RUBIN, an individual, GAIL JOHNSON, an individual, SUSAN J. KATZ AND MARVIN A. KATZ, as Trustees of the SUSAN J. KATZ REVOCABLE TRUST and the MARVIN A. KATZ REVOCABLE TRUST, the KATZ FAMILTY LIMITED PARTNERSHIP, an entity, LEO LATINI, an individual, MARGARET (AKA PEGGY) LATINI, an individual, KENNETH FOX, an individual, JOANNE ROTHBLUM, an individual, ALAN SHERMAN, an individual, MARIANNE SIROTT, an individual, JOANN SOUREK, an individual, CHARLES SOUREK, an individual, CSJS HOLDINGS, an entity, MARK WINEBERG, an individual, GARY ZEAL, an individual, MARK ZEAL, an individual, CHRISTOPHER ST. JOHN, an individual, DAVID ST. JOHN, an individual, DCNA PROPERTIES, LLC, a limited liability company, SUSAN ST. JOHN, Trustee of the HAYDEN ST. JOHN TRUST, HBH, INC., a corporation, JOHN DAVIES, an individual, SHARON DAVIES, an individual, PETER GLUKLICK, an individual, HELEN ROSS, an individual, ROBERT STARKS, an individual, CAROL STARKS, an individual, STEVIE BAHAMA LLC, a limited liability company, DENA LOWENBACH, an individual, GENA AVENI, an individual, STEVEN KUTNICK, an individual, SALVATORE MERCURIO, an individual, ROSEMARIE MERCURIO, an individual, CLARE PINTO, an individual, JOHN SHAUGHNESSY, an individual, HOWARD VORDER BRUEGGE, an individual, SUSAN STAFFORD, an individual, ROBERT NEWTON, an individual, BONNIE NEWTON, an individual, and all others similarly situated,

Plaintiffs,

vs.

CITY NATIONAL BANK, N.A., a national banking association, and DOES 1 through 10, inclusive,

Defendants.

**COMPLAINT**

#_____CV____

**DEMAND FOR JURY**

**CLASS ACTION**

The named Plaintiffs, on behalf of themselves and also as putative representatives of the class members as defined herein, allege with particularity as follows:

## I.      SUMMARY OF THE ACTION

1.      This is a class action brought by the named plaintiffs (hereinafter the "Class Representatives") on behalf of approximately 500 to 600 people and entities located in approximately 36 States other than California (the Class Representatives and the putative class members are hereinafter collectively referred to as the "Plaintiffs").  The Plaintiffs were victims of a long-term (15-year) ATM Ponzi scheme (the "ATM Ponzi Scheme," as defined below), who lost approximately $45 million, which they invested in the ATM Ponzi Scheme from 2009 to 2014.  Other victims in California alone lost approximately $90 million or more as a result of the ATM Ponzi Scheme.

2.      Joel Barry Gillis ("Gillis") and Edward W. Wishner ("Wishner") (non-defendants and collectively, the "ATM Ponzi Scheme Operators") operated the ATM Ponzi Scheme from Woodland Hills, California, and regularly used the mails and interstate communications to send and receive money and other materials to and from most of the fifty states in order to further the ATM Ponzi Scheme.  The ATM Ponzi Scheme succeeded during the last five (5) years from 2009 to 2014 only because defendant City National Bank, N.A ("CNB"), acting through non-defendant Patrick Brian Fitzwilliam ("Fitzwilliam"), one of its Senior Vice-Presidents, joined and furthered the ATM Ponzi Scheme and knowingly provided substantial assistance, and because other CNB employees assisted him.  During the fifteen year ATM Ponzi Scheme, CNB's Woodland Hills branch, with Fitzwilliam's participation, served as the sole location where the Ponzi Scheme Operators opened accounts and banked with impunity.

3.      Fitzwilliam was a knowing and active promoter and participant in furthering the ATM Ponzi Scheme in numerous ways.  Among other things, Fitzwilliam exercised control over proceeds and disbursements of the funds in the NASI's accounts at CNB (the "Accounts"); moved stolen investor funds to and from Accounts; used CNB funds to cover negative bank balances and prevented bounced checks for the Accounts; used CNB's credibility and status to

promote the ATM Ponzi Scheme by vouching to many Plaintiffs and other potential investors for the integrity of the ATM Ponzi Scheme Operators and their business; sent sending promotional, vouching letters; and actively misrepresented the status of funds flowing through the Accounts to investors and potential investors. While doing this, he was a substantial investor in the ATM Ponzi Scheme, received a substantial profit on his investment and other special accommodations from the ATM Ponzi Scheme Operators, and had a very strong motive to continue, promote, and cover up the ATM Ponzi Scheme to existing and new investors.

4. Fitzwilliam and his wife, non-defendant Betty Saleh Fitzwilliam ("Saleh"), "invested" in the ATM Ponzi Scheme for years in order to collect the minimum guaranteed 20% return, then "cashed out" most of their investment when they knew that the risk of its discovery was imminent. Fitzwilliam is now on administrative leave from CNB.

5. Unless otherwise specifically stated hereafter, each of the acts of Fitzwilliam identified herein was committed in the regular course and scope of his employment by CNB, which is directly and vicariously liable for his actions.

6. The declarations of Edward Wishner, Jon Currie, Mark Soffa, and Stoney Wilson, filed in other cases, are submitted as Exhibits 1, 2, 3, and 4 hereto and are incorporated into these pleadings by reference. They and the complaint refer to a Master List of exhibits, a copy of which is Exhibit 5, which list and exhibits CNB already has. This complaint does not refer to all the exhibits on the Master List, but when it refers to exhibits on the Master List to support factual assertions, this complaint refers to them by exhibit number on the Master List, and pages, for example "Exhibit ML- ___, pages ___," and incorporates them by reference.

7. The ATM Ponzi Scheme Operators owned and operated Nationwide Automated Systems, Inc. ("NASI"), through which they operated the ATM Ponzi Scheme.

8. On September 17, 2014, the SEC filed a complaint against NASI in the United States District Court for the Central District of California. *SEC v. Nationwide Automated Systems, Inc.*, Case No. cv-14-07249-SJO. In that case, United States District Judge Otero placed NASI in receivership and appointed William Hoffman as Receiver of NASI (the

"Receiver").  On September 30, 2014, the Receiver, with the permission of Judge Otero, filed suit against CNB, Fitzwilliam, and his wife Saleh.  *Hoffman v. City National Bank*, Case No. BC624542 (C.D.N.Y) ("Receiver Action").

9.      Shortly thereafter, Gills and Wishner pled guilty to federal crimes of conspiracy, mail fraud, and wire fraud for operating the ATM Ponzi Scheme and were sentenced to lengthy federal prison terms, which they are now serving.

10.      The ATM Ponzi Operators operated the ATM Ponzi Scheme by using false and fraudulent representations and the United States mails and interstate wire communications to convince the Plaintiffs to enter into purported sale-and-leaseback agreements with NASI.

11.      Among other things, the ATM Ponzi Operators falsely told investors in uniform solicitations that (i) NASI was in the business of selling, placing, operating and maintaining ATM's; (ii) NASI owned and operated two-thirds of the machines and sold and leased back one-third of the ATM's to investors; (iii) Investors could purchase the ATM's from NASI, and then lease them back to NASI, in return for "rent" of 50 cents per ATM transaction, with a guaranteed return of at least 20% per year; and (iv) the rent payment was a portion of each alleged transaction fee earned on the ATM bought by each Plaintiff, which NASI had in turned placed at business locations.

12.      Based on these and other representations, the Plaintiffs purchased ATM's from NASI in order to lease the ATM back to NASI in exchange for NASI paying them "rent payments" of 50 cents per ATM transaction and guaranteeing investment return of at least 20% per year.  The ATM's were purchased by investors at the cost of either $12,000 or $19,800 per machine.

13.      All of these and other representations made to Plaintiffs were false, fraudulent, and misleading, as Fitzwilliam fully knew.

14.      Fitzwilliam knew  from the CNB Account records that he managed that (i) there was legitimate ATM transaction revenue from only the real ATM's owned by NASI (approximately 250 ATM's) and that this represented only a tiny fraction of NASI's actual

receipts; (ii) the vast percentage of NASI's receipts consisted only of funds received from new investors deposited into the General Account at CNB only for the specific purpose of acquiring ATM machines; (iii) NASI was paying rent to place only about 250 ATM's, rather than the thousands of ATM's NASI represented it had sold and leas; and (iv) to an overwhelming degree, investors' funds were not used to actually acquire, sell, lease, place, operate, and maintain the thousands of ATM's NASI claimed to have sold them, but were instead used to further and conceal the Ponzi  by making phony "rent" payments from the NASI "Investors Account" at CNB to earlier investors.

15.     A brief cursory review of NASI's CNB Accounts activity instantly revealed this was a Ponzi scheme. While the Plaintiffs and the Class had no opportunity to look at NASI's CNB Account records, Fitzwilliam had and used his unfettered access to these bank records and he had the personal motive to look at these records, and he did so. One example is Fitzwilliam's computer screen shot of the General Account # 4410 which he emailed to Gillis on April 25, 2013. Exhibit ML-10, page 751.  Upon information and belief, CNB's computer records should identify each time Fitzwilliam looked at the NASI file from his office computer, and upon information and belief, he did this almost every business Exhibit 3, Soffa Decl. ¶18.

16.     Upon information and belief, CNB's and NASI's records reflect that as of June 2014, NASI had allegedly sold and was leasing back more than 31,000 purported ATM's.  In reality, NASI had less than 300 ATM's in existence, and the vast majority of NASI's revenue was comprised of new investor funds, which the ATM Ponzi Scheme Operators, aided and abetted by CNB, recycled to Plaintiffs as alleged "rent payments" to provide the guaranteed returns NASI owed to earlier investors.

17.     From the inception of the ATM Ponzi Scheme to its collapse in August 2014, the ATM Ponzi Operators used identical, uniform form agreements executed by Joel Gillis and each Plaintiff.  Each identical form agreement contained uniform misrepresentations, on which the Plaintiffs reasonably relied to purchase one or more ATM's from NASI.   The form agreements between Plaintiffs and NASI are Exhibits ML-3 and ML-4.

18.     For each ATM NASI sold to Plaintiffs, NASI agreed to collect the rent due, hold it, and then pay it to Plaintiffs.  NASI agreed to account for the rent collected and remit to each Plaintiff a monthly report of ATM transactions (the "Investor Summary Report") along with the rent check.  NASI represented and guaranteed that the fifty cent rent, consisting of a portion of each transaction fee, would generate, at a minimum, a 20% annualized return to Plaintiffs, and that, if it did not, NASI would make up the difference.  These representations were false, fraudulent, and misleading.

19.     A critical part of the ATM Ponzi Scheme was to make lulling payments to Plaintiffs in the form of the rent payments for their ATM machines so they would be assured that their investment was sound and secure.  The ATM Ponzi Scheme also included laundering the stolen money through other businesses, thereby attempting to generate additional funds for the co-schemers and to hide the proceeds.

20.     Beginning in 1996, NASI became a long-term and financially significant customer of CNB at its branch in Woodland Hills, California.  Fitzwilliam knew that NASI's only bank was CNB.  From 2006 through 2014, approximately $400 million of investors' money flowed into and out of NASI's Accounts, generating substantial service fees and profits for CNB and compensation for Fitzwilliam.

21.     The ATM Ponzi Scheme Operators exclusively used NASI's "General Account" at CNB to deposit money received from Plaintiffs for their purported purchase of ATM's.  They exclusively use NASI's "Investors Account" at CNB to make lulling payments in the form of the purported rental income paid to Plaintiffs.  They exclusively used NASI's "Locations Account" at CNB to pay each month the 250 checks for lease of the 250 separate locations that housed the 250 real ATM's.  Generally, the funds were paid and received by the United States mail to further the ATM Ponzi Scheme.

22.     Fitzwilliam managed all of these Accounts for NASI, which he called by their names -- "General Account," "Investors Account," and "Locations Account." (collectively, the Accounts).

23.     While in charge of the NASI Accounts, Fitzwilliam also became a significant investor in the ATM Ponzi Scheme, using fictitious names or nominees to conceal his involvement from CNB.  He made his first investment in NASI ATM's in November of 2006.  ML-6 at pages 201 to 206.  He knew it was a Ponzi scheme, when he invested, but if he did not know then, after he became an investor, because of his operational knowledge and actions concerning the CNB Accounts, his ATM transactions with NASI, his conversations with the ATM Ponzi Scheme Operators, and otherwise, Fitzwilliam quickly learned that the ATM Ponzi Operators were operating the ATM Ponzi Scheme selling non-existent ATM's and using CNB to physically collect and disburse the stolen funds and make the lulling payments.  He knew this when he and Saleh made further ATM purchases from NASI and earned substantial income from the ATM Ponzi Scheme.  In total, Fitzwilliam and Saleh made payments of $480,000 to NASI to purchase ATM's and received rent and other payments from NASI of $735,643.50, and were net winners of $255,643.50.  Exhibit ML-15, pp. 835-37.   The Plaintiffs are all net losers.

24.     CNB (through Fitzwilliam) participated in the ATM Ponzi Scheme knowingly and provided substantial assistance to it.  As Wishner admitted, "Fitzwilliam was a critical part of NASI's ability to function. . . ."  Exhibit 1, Wishner Decl. ¶38.  CNB's knowledge of the Scheme was also based on information learned by other CNB employees in the course of their performance of customary banking services.  CNB's knowledge was not based on performing any of its regulatory/investigative duties.

25.     Fitzwilliam's investment was not a mistake. His wife Saleh was, at all times material to this case, very knowledge about Ponzi schemes and recognizing them and similar fraudulent financial crimes, because, acting as a licensed financial advisor, she was perpetrating her own financial crimes against her innocent clients using similar methods, artifices, and devices.  On or about June 25, 2009, her employer Wedbush Securities fired her for defrauding her elderly investment clients by using forgery, lies, and fabricated client account statements in order to steal thousands of dollars from her elderly and inform clients and earn small commissions on insurance annuities for herself and Fitzwilliam.

26.     Fitzwilliam and Saleh determined that it was safe for them to buy phony ATM's from NASI and continue owning them in order to earn 20% during the great recession, because Fitzwilliam could monitor at all times their investments, due to his unfettered access to NASI's bank records.   Because of this, Fitzwilliam and Saleh knowingly invested in the ATM Ponzi Scheme and made a handsome profit of over $250,000.   In addition, just 7 days before NASI started bouncing checks for the last time and 16 days before August 22, 2014, when CNB fired NASI as a client, they also took $60,000 from NASI.  Compare Exhibits ML-13 and ML-24.

## II.     JURISDICTION AND VENUE

27.     This Court has personal jurisdiction over defendant CNB, because it is a resident of New York County, New York, Southern District of New York, conducted banking business here, and furthered the ATP Ponzi Scheme by facilitating purchase payments and lulling payments to and from NASI and Plaintiffs residing in New York in connection with the matters that are the subject of this complaint

28.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) (2) (A), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and Plaintiff(s), together with most members of the proposed Class are citizens of states different from Defendant.

29.     The Class Representatives are citizens of New York, Connecticut, Florida, Illinois, Kansas, Massachusetts, Michigan, New Jersey, Nevada, Tennessee, and Texas, and Defendant is a citizen of California pursuant to 28 U.S.C. § 1348.

30.     Upon information and belief, more than two-thirds of all of the members of the proposed Class in the aggregate are citizens of a state other than New York, where this action is originally being filed, and the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

31.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(a) because Defendant is subject to personal jurisdiction in this district with respect to this civil action

pursuant to N.Y. C.P.L.R. § 302(a) (3) (i), and therefore resides in this district pursuant to 28 U.S.C. § 1391(c) (2).

## III.    PARTIES

### A.    Plaintiffs

32.    The Plaintiffs lost approximately $45 million, with the exact amount to be proven at trial.

33.    The Plaintiffs identified below, who are the putative Class Representatives, have each agreed to serve as Class Representatives and to act for the benefit of all net losers in the Class.

34.    Each of the Plaintiffs received the uniform agreements from NASI which contained false statements, reasonably relied on the false statements, and were defrauded into buying ATM's that did not exist.  Plaintiffs have collectively lost substantial funds due to the Defendant's misconduct.   The Class Representatives reasonably relied on the same false agreements relied upon by all members of the putative Class.

35.    In furtherance of the ATM Ponzi Scheme, NASI sent to all Plaintiffs, by U.S. Mail or overnight delivery, in their respective states, including more than 35 Plaintiffs in New York and the Class Representatives, substantially uniform NASI ATM Sale Agreements and ATM Lease Agreements, and other materials.   All Plaintiffs executed their NASI ATM Sale Agreements and their ATM Lease Agreements and returned them to NASI, generally by U.S. Mail.   After these documents were signed, and up until the collapse of the Ponzi scheme in August 2014, in furtherance of the ATM Ponzi Scheme, NASI sent all Plaintiffs by U.S. Mail (i) monthly fraudulent Investor Summary Reports detailing the alleged transactions at their ATMS, and (ii) "rent" payments from the alleged transactions at their ATMs.   The losses set forth below are approximate net losses after subtracting "rent" payments received from purchase payments made and adding other expenses paid, but do not necessarily include all damages suffered by each person or identified, such as additional fees and expenses.   Each loss is subject to a final determination by the jury at trial.

(i)      Plaintiff Thomas B. Wilinsky, Trustee of the Jennifer Wynne Reeves Trust, a New York Trust located in New York County, New York.  Jennifer Wynne Reeves, deceased, a New York resident, purchased 7 ATM machines from NASI and lost approximately $82,180.00 as a result of the ATM Ponzi Scheme.    The Jennifer Wynne Reeves Trust is the successor in interest to the rights and claims of Jennifer Wynne Reeves.

(ii)      Plaintiff Steve Rubin ("Rubin"), a resident of Fairfield County, Connecticut.  Rubin, when over the age of 65, bought 15 ATM machines from NASI, and lost more than $22,000 as a result of the ATM Ponzi Scheme.

(iii)      Plaintiff Gail Johnson ("Johnson"), a resident of Palm Beach County, Florida.  Johnson, when over the age of 65, bought 4 ATM machines from NASI, and lost approximately $35,278.71 as a result of the ATM Ponzi Scheme.

(iv)      Plaintiffs Katz Family Limited Partnership, organized in Ohio, and the Susan J. Katz Revocable Trust and the Marvin A. Katz Revocable Trust, Ohio Trusts.  Susan J. Katz and Marvin A. Katz (the "Katzes"), residents of Palm Beach County, Florida, but residents of Ohio at the time they purchased ATM machines from NASI.  Through the Katz Family Limited Partnership, organized in Ohio, the Katzes, when over the age of 65, purchased 20 ATM machines from NASI and lost approximately $139,393.50 as a result of the ATM Ponzi Scheme. The Katz Family Limited Partnership has transferred the rights of Susan Katz and Marvin Katz with respect to NASI to the Susan J. Katz Revocable Trust and the Marvin A. Katz Revocable Trust, respectively.

(v)      Plaintiffs Leo Latini and and Margaret, aka Peggy, Latini (the "Latinis"), residents of Sarasota County, Florida.  Leo Latini purchased 7 ATM machines from NASI in an IRA under his name, Margaret Latini purchased 8 machines from NASI in an IRA under her

name.  Together they purchased 5 ATM machines from NASI.  Leo Latini was over the age of 65 when he purchased the machines in his IRA and when he and Peggy purchased their joint machines.   As a result of the ATM Ponzi Scheme, Leo Latini's IRA lost a certain sum, Margaret Latini's IRA lost a certain sum, and the Latinis jointly lost an additional   approximately $29,493.50.  It is estimated that the Latinis total losses exceed $200,000.

(vi)     Plaintiff Kenneth Fox ("Fox"), a resident of Cook County, Illinois. Fox bought 2 ATM machines from NASI and lost approximately $9,275 as a result of the ATM Ponzi Scheme.

(vii)    Plaintiff Joanne Rothblum ("Rothblum"), a resident of in Lake County, Illinois.  Rothblum bought 2 ATM machines from NASI and lost approximately $7,921 as a result of the ATM Ponzi Scheme.

(viii)   Plaintiff Alan Sherman, a resident of Cook County, Illinois.   Alan Sherman bought 2 ATM machines from NASI and lost approximately $5,838.50 as a result of the ATM Ponzi Scheme.

(ix)     Plaintiff Marianne Sirott, a resident of Cook County, Illinois.  Marianne Sirott bought 4 ATM machines from NASI and lost approximately $48,000 as a result of the ATM Ponzi Scheme.

(x)      Plaintiffs JoAnn Sourek and Charles Sourek (the "Soureks"), residents of Cook County, Illinois, and CSJS Holdings, an Illinois entity.  The Soureks, when over the age of 65, purchased from NASI 5 ATM machines individually in the name JoAnn Sourek, 5 ATM machines in the name Charles Sourek, and 6 machines jointly in the name of the entity CSJS Holdings.  As a result of the ATM Ponzi Scheme, JoAnn Sourek lost approximately $40,291.50,

Charles Sourek lost approximately $38,398.50, and CSJS lost approximately $70,021.00. Combined, the Soureks, through their entity and as individuals lost approximately $148,711.00.

(xi)    Plaintiff Mark Wineberg ("Wineberg"), a resident of Cook County, Illinois. Wineberg bought 3 ATM machines from NASI and lost approximately $31,762 as a result of the ATM Ponzi Scheme.

(xii)    Plaintiff Gary Zeal ("Gary Zeal"), a resident of Lake County, Illinois. Gary Zeal bought 4 ATM machines from NASI and lost approximately $8,791 as a result of the ATM Ponzi Scheme.

(xiii)    Plaintiff Mark Zeal ("Mark Zeal"), a resident of Cook County, Illinois. Mark Zeal, when over the age of 65, bought 2 ATM machines from NASI and lost approximately $9,487.00 as a result of the ATM Ponzi Scheme.

(xiv)    Plaintiff Christopher St. John, a resident of Shawnee County, Kansas. Christopher St. John bought 9 ATM machines from NASI and lost approximately $75,932.50 as a result of the ATM Ponzi Scheme.

(xv)    Plaintiff David St. John, a resident of Shawnee County, Kansas. David St. John bought 5 ATM machines from NASI and lost approximately $49,779.00 as a result of the ATM Ponzi Scheme.

(xvi)    Plaintiff DCNA Properties, LLC ("DCNA"), a limited liability company organized under the laws of the State of Kansas, with its headquarters in Shawnee County, Kansas. David St. John is the manager of DCNA. DCNA bought 8 ATM machines from NASI and lost approximately $55,039.50 as a result of the ATM Ponzi Scheme.

(xvii)    Plaintiff Susan St. John, trustee of the Hayden St. John Trust ("H.S.J. Trust"), a Kansas trust with its mailing address in Shawnee County, Kansas. The H.S.J. Trust

bought 22 ATM machines from NASI and lost approximately $98,835.50 as a result of the ATM Ponzi Scheme.

(xviii) Plaintiff HBH, Inc. ("HBH"), a corporation organized under the laws of the State of Kansas, with its headquarters in Shawnee County, Kansas.  Christopher St. John is the president of HBH.  HBH bought 27 ATM machines from NASI and lost approximately $95,064.00 as a result of the ATM Ponzi Scheme.

(xix)   Plaintiffs John Davies and Sharon Davies (the "Davies"), residents of Hampden County, Massachusetts.  John Davies bought 10 ATM machines from NASI and lost approximately $27,294.50 as a result of the ATM Ponzi Scheme.  Sharon Davies bought 2 ATM machines from NASI and lost approximately $5,459.00 as a result of the ATM Ponzi Scheme. Together, the Davies lost $32,753.50 in the ATM Ponzi Scheme.

(xx)    Plaintiffs Peter Gluklick and Helen Ross (the "Gluklicks"), residents of Oakland County, Michigan.  The Gluklicks bought 9 ATM machines from NASI and lost approximately $55,750 as a result of the ATM Ponzi Scheme.

(xxi)   Plaintiffs Robert Starks and Carol Starks (the "Starks"), residents of Berrien County, Michigan.  The Starks, when over the age of 65, bought 7 ATM machines from NASI. They lost approximately $80,259.00 as a result of the ATM Ponzi Scheme.

(xxii)  Plaintiff Stevie Bahama LLC, a limited liability corporation, organized under the laws of the State of Nevada, and headquartered in Nevada.  Sevag Mardirossian is the sole owner of Stevie Bahama, LLC.  Stevie Bahama, LLC bought 10 ATM machines from NASI and lost approximately $120,000 as a result of the ATM Ponzi Scheme.

(xxiii) Plaintiff Dena Lowenbach ("Lowenbach"), a resident of Essex County, New Jersey.  Lowenbach, when over the age of 65, bought 8 ATM machines from NASI in her

name and bought 10 AM machine in her IRA.   Combined, both of these investments lost approximately $83,379 as a result of the ATM Ponzi Scheme.

(xxiv)  Plaintiff Gena Aveni ("Aveni"), a resident of Cuyahoga County, Ohio. Aveni, when over the age of 65, bought 2 ATM machines from NASI.  She lost approximately $24,000 as a result of the ATM Ponzi Scheme.

(xxv)   Plaintiff Steven Kutnick ("Kutnick"), a resident of Summit County, Ohio. Kutnick, when over the age of 65, bought 10 ATM machines from NASI and lost approximately $65,525.50 as a result of the ATM Ponzi Scheme.

(xxvi)  Plaintiffs Salvatore Mercurio and Rosemarie Mercurio ("the Mercurios"), residents of Cuyahoga County, Ohio.  The Mercurios bought 3 ATM machines from NASI and lost approximately $19,995 as a result of the ATM Ponzi Scheme.

(xxvii) Plaintiff Clare Pinto ("Pinto"), a resident of Cuyahoga County, Ohio. Pinto, when over the age of 65, bought 6 ATM machines from NASI.  She lost approximately $23,000 as a result of the ATM Ponzi Scheme.

(xxviii) Plaintiff John Shaughnessy ("Shaughnessy"), a resident of Cuyahoga County, Ohio.   John Shaughnessy purchased 4 ATM machines from NASI with his mother Dorothy Gunsch, deceased, in 2010 and 2013.  Both were over the age of 65 at the time.  When Ms. Gunsch passed away, Shaughnessy became the sole owner of those 4 machines and succeeded to any claims and rights of Gunsch.   On May 21, 2014, Shaughnessy then purchased one ATM machine from NASI.  Shaughnessy lost approximately $35,213 as a result of the ATM Ponzi Scheme.

(xxix)  Plaintiffs Howard Vorder Bruegge ("Vorder Bruegge") and Susan Stafford ("Stafford"), residents of Shelby County, Tennessee.  Vorder Bruegge, when over the age of 65,

bought 3 ATM machines from NASI. Stafford bought additional machines and inherited additional machines from her mother and succeeded to the rights and claims of her mother. Vorder Bruegge lost approximately $50,000 as a result of the ATM Ponzi Scheme. Stafford lost approximately $25,000 as a result of the ATM Ponzi scheme.

(xxx)   Plaintiffs Robert Newton and Bonnie Newton (the "Newtons"), residents of Hood County, Texas. The Newtons, when over the age of 65, bought numerous ATM machines from NASI. They lost approximately $7,800 as a result of the ATM Ponzi Scheme.

**B.      Defendant and Co-Schemers**

36.      Defendant CNB was at all relevant times a national banking association doing business in Los Angeles, California, providing banking, investment and trust services through 75 offices, including regional centers in California, Nevada, New York City, Nashville, and Atlanta. As of October 2015, CNB and its investment affiliates manage or administer $59.4 billion in client investment assets, including $46.3 billion under direct management. CNB was the depository bank used exclusively by the NASI ATM Ponzi Operators, and the employer of Fitzwilliam. CNB was a co-schemer of the ATM Ponzi Scheme.

37.      From approximately 1996 through August 20, 2014, CNB was the primary, if not the sole, banking institution used to carry out the fifteen year Ponzi scheme at issue in this matter. NASI's accounts were established at CNB's Woodland Hills branch, and NASI, through its employees, operated the scheme through Fitzwilliam and the CNB Accounts without disguising the true flow and characterization of NASI funds. The vast majority, if not all, of the investors' approximately $400 million in payments to purchase the fictitious ATM's were deposited into CNB accounts. These same accounts, with the full knowledge and participation of Fitzwilliam and CNB, were then used to make the approximately $300 million in Ponzi-style payments to NASI investors for the sham profits generated by the non-existent ATM machines, as well as to divert millions of dollars of stolen funds to NASI's employees and/or their other companies.

38.     NASI and its principals were high profile and lucrative customers for CNB, and this contributed to their special management and treatment within CNB's Woodland Hills branch. CNB's involvement in and knowledge of the Ponzi scheme occurred through the personalized attention given NASI by Fitzwilliam, who personally researched, oversaw, and serviced NASI's Accounts.

39.     Co-schemer Fitzwilliam was all times material to this case a Senior Vice President of CNB and Branch Manager of the Woodland Hills branch, where the NASI ATM Ponzi Operators deposited and laundered the proceeds of the ATM Ponzi Scheme. Fitzwilliam was also co-owner of the entity known as Bribet Services, which purchased ATM's from NASI. Fitzwilliam was a co-schemer of the ATM Ponzi Scheme. Co-Schemer Betty Saleh is the wife of Fitzwilliam, and co-owner of Bribet Services. Though Saleh was previously licensed as an investment advisor, FINRA revoked her license and has permanently barred her from acting as a broker or otherwise associating with firms that sell securities after FINRA determined that she had executed unauthorized and unsuitable transactions and defrauded her own investment clients by forgery, oral and written lies, fabricating documents and preparing false account statements on her employer's stationary that was sent to her customers to conceal her prior thefts. Saleh was a co-schemer of the ATM Ponzi Scheme.

40.     Co-Schemer Gillis is now incarcerated in Lompoc, California, at the United States Prison as prisoner number 68556-112. Gillis was, at all times material to this case, the President of NASI and a signatory on its bank accounts at CNB. Gillis has been convicted of, among other things, wire fraud and mail fraud arising out of his operation of the ATM Ponzi Scheme. Gillis was a co-schemer of the ATM Ponzi Scheme.

41.     Co-Schemer Wishner is now incarcerated in San Pedro, California, at Terminal Island as prisoner number 68555-112. Wishner was the Treasurer, Vice President, and Secretary of NASI and a signatory on its bank accounts at CNB. Wishner has been convicted of, among other things, mail fraud and wire fraud arising out of his operation of the ATM Ponzi Scheme. Wishner was a co-schemer of the ATM Ponzi Scheme.

42.     Co-Schemer NASI is now in receivership, and there is a stay of litigation against NASI.  NASI was not registered with the SEC and did not register any offering or class of securities with the SEC.  NASI was a co-schemer of the ATM Ponzi Scheme.

43.     Co-Schemer Fuel Doctor, LLC ("Fuel Doctor") was used by the ATM Ponzi Operators to further the ATM Ponzi Scheme, and received large transfers of stolen funds from NASI (over $6 million).  Fuel Doctor, like NASI, also had an account at CNB which Fitzwilliam monitored and oversaw the transfers of stolen funds from NASI to Fuel Doctor.

C.      **Class Allegations**

44.     The Class Representatives bring this action on their own behalf and as Class Representatives pursuant to Fed. R. Civ. P. 23.  Plaintiffs seek to represent a class (the "Class") initially defined as all non-California persons and entities, who purchased  ATM's from NASI and sustained net losses calculated as total principal paid minus total rents received, plus other damages.

45.     The Class excludes the Defendant CNB, Fitzwilliam, Saleh, and any person, corporation, or other entity related to, controlled by, or affiliated with them, including any representatives and successors in interests to them.

46.     The Class is so numerous that joinder of all members is impracticable. The proposed Class consists of approximately 500-600 victims of the Defendant's conduct located in approximately 36 States other than California, who lost approximately $45 million, which they invested in the ATM Ponzi Scheme from 2009 to 2014.

47.     The Fraud was uniform.  The ATM Ponzi Operators sold the Plaintiffs their ATM's through a standard package of agreements that contained numerous false statements and uniform material misrepresentations and omissions. The form agreements included (i) an ATM Equipment Sale Agreement; (ii) an ATM Equipment Lease Agreement; and (iii) an Addendum To Owner Lease Agreement ("Addendum").  The three documents were mailed or emailed to Plaintiffs, including to New York, and executed by the Plaintiffs and Gillis on behalf of NASI, at

the time or times the Plaintiffs bought their machines. These agreements as well as the prices charged never changed.

48.     In its ATM Sale Agreements and Lease Agreements, NASI made the following uniform representations to investors, including the Plaintiffs, regarding their investment with NASI.  All of these statements were false, misleading, and made in furtherance of the fraudulent ATM Ponzi Scheme:

> (a)   Buyers were buying from NASI an actual ATM, identified by serial number, "free and clear of all liens, claims, debts, encumbrances, security interests, or other charges."
>
> (b)   The ATM's purchased would then be installed by NASI at a designated place—typically, hotels, convenience stores, and gas stations located across the United States.
>
> (c)   Following the sales transaction, buyers' ATM's would remain, at all times, their "sole and exclusive personal property."
>
> (d)   During the lease term, NASI would "operate and maintain the ATM's ... includ[ing] ... processing and accounting for all ATM transactions, obtaining, the [sic] delivering and loading of cash for the ATM's, and repairing, maintaining and servicing the ATM's," "maintain insurance coverage on the ATM's," and "pay, prior to delinquency, all personal property taxes assessed against and levied upon the ATM's."
>
> (e)   During the lease term, NASI would pay to buyers 50 cents per transaction occurring in their ATM's, with NASI agreeing that in the event of a shortfall, it would guarantee a 20% annual return on investment; NASI said that it was able to make this guarantee because with ATM transaction fees typically being in the range of $2.50-$3.00—well above the 50 cents per transaction in rent owed by NASI under the lease, and NASI could guarantee a 20% return by shifting part of its share of the ATM

transaction revenue back ATM buyers.

(f) Each month, NASI would send buyers transaction reports that purportedly detailed the performance of the ATM's that they owned; these transaction figures would then form the basis for NASI's monthly payments to investors.

49.     The ATM Ponzi Operators ran the ATM Ponzi Scheme through the use of fraud. Every month, each NASI investor received an Investor Summary Report reflecting monthly transaction figures for the ATM's that they "owned." These reports were sent and each was a complete fabrication. The reported false figures represented transactions that never occurred on ATM's they never owned and never existed.

50.     There are questions of law and fact that are common to the Class and predominate over questions affecting any individual class member, including, but not limited to:

a.     Whether Gillis and Wishner engaged in fraud;

b.     Whether the knowledge and conduct of Fitzwilliam with respect to the fraud may be imputed to CNB;

c.     Whether Fitzwilliam and CNB provided substantial assistance to the fraud after Fitzwilliam had knowledge of it; and

d.     Whether CNB provided substantial assistance to the fraud after it had knowledge of it.

51.     The Class Representatives' claims are typical of the claims of the Class as a whole. They are members of the Class and have suffered damages as a result of the unlawful course of conduct of Gillis, Wishner, Fitzwilliam, and CNB, and are likely to continue to suffer harm due to their loss of funds.

52.     The Class Representatives and their counsel will fairly and adequately protect the interests of the Class. The interests of the Class Representatives are consistent with and not antagonistic to the interests of the Class. The Class Representatives have lost large amounts

collectively and have agreed to act for the benefit of all of the victims similarly situated and not to put the Class Representatives' individual interest ahead of any member of the Class. The Class Representatives have retained competent counsel experienced in prosecuting complex fraud actions and Ponzi schemes cases.

53.     A class action is superior to all other available methods for the fair and efficient adjudication of the claims of Plaintiffs.

54.     The interest of members of the Class in individually controlling the prosecution of separate actions is low. Due to the complexity of the case, individual Class members would be unlikely and unwilling to individually prosecute an action without joining their claims with other claimants. The amount of damages varies from a few thousand dollars to larger amounts. Victims with very large claims may opt out and prosecute their own cases. Separate suits on the smaller claims would be impractical, and settlements with CNB and any insurers will require complete closure of all claims, which favors the use of the class mechanism. Concentrating litigation in one federal forum will promote judicial efficiency.

55.     This proposed class action is manageable. NASI used standardized form agreements for all investors. The conduct of Gillis, Wishner, Fitzwilliam, and CNB was identical with respect to all members of the Class, and the identities of all members of the Class are readily ascertainable.

56.     Class action status is also warranted under Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by numerous individual members of the Class may create a risk that inconsistent or varying adjudications would establish incompatible standards of conduct for the parties opposing the Class, and may substantially impair or impede the interests of other members of the Class to protect their interests.

57.     The acts and actions of the defendant applicable to the Class Representatives apply generally to the Class, thereby making the final relief granted by the Court applicable to the Class as a whole.

**D.     Other Class Suits**

58.     On March 18, 2016, a putative class action suit was filed in the United States District Court for Central District of California, *Madison v.* Gillis, *et al.,* Case No. 16-cv-00502 (SJO), on behalf of a purported nationwide class of NASI net losers (residing in California and states other than California) against Gillis, CNB, Fitzwilliam, Wishner, and Saleh ("Madison Federal California Action"). The pendency of the Madison Federal California Action and the Receiver Action tolled the statute of limitations applicable to each Plaintiff in this action. In addition, counsel for the putative class in the Madison Federal California Action entered into a tolling agreement with counsel for CNB that also tolled the statute of limitations applicable to each Plaintiff in this action. In addition, on May 25, 2017, pursuant to an order of the Court with respect to a further stipulation between counsel for the putative class in the Madison Federal California Action and counsel for CNB, the Madison Federal California Action was dismissed without prejudice, and CNB agreed that the filing date of the Madison State California Action would be deemed March 18, 2016 (the filing date of the Madison Federal California Action), with the effect that the statute of limitations applicable to each Plaintiff in this action is similarly tolled. On June 28, 2017, counsel for the same putative class in the Madison Federal California Action refiled the putative class action complaint in the State Court, Los Angeles County, *Madison v. City National Bank, N.A., et al.,* case no. BC 666719 ("Madison State California Action"). As a result of the foregoing, the statute of limitations applicable to each Plaintiff in this action is tolled from no later than March 18, 2016, through the filing of the State California Action and further through the filing of this action.

59.      In addition, on March 29, 2017, counsel other than counsel in the Madison State California Case file a separate putative class case in California State Court, Los Angeles County, *Paine v. City National Bank, N.A., et al.,* case BC 655806.

60.     There has been no class certification or discovery in any other putative class case.

61.     This action is brought on behalf of Plaintiffs, a class of non-California residents who are net losers, in order to fully protect the interests of all non-California residents who are

net losers, because their rights cannot be adequately protected by the pending actions in the State of California, which would be an unfair and unjust result.

**E.      Does Allegations**

62.      Plaintiffs are ignorant of the true names and capacities of those defendants sued herein as DOES 1 through 10, and therefore sue these defendants by those fictitious names. Plaintiffs will seek leave to amend this Complaint to allege the DOE defendants' true names and capacities when they are ascertained.  Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by the Plaintiffs and members of the Class.

## IV.      FRAUDULENT CONCEALMENT

63.      In order to operate and continue a Ponzi scheme for any period of time without being detected, it is necessary for the schemers to falsify records and statements in order to lull victims into believing that the transactions and payments to them are legitimate so that they will not detect and report the scheme and cause its collapse.  CNB, and the ATM Ponzi Scheme Operators, and all others aiding and abetting the ATM Ponzi Scheme, as part of and in furtherance of the ATM Ponzi Scheme and to maintain it, cover it up, and avoid detection, sent thousands of lulling payments and reports of fictitious activity to Plaintiffs, including in New York, in order to lull them into believing this was a legitimate enterprise, and CNB also provided letters that were sent to many of the Plaintiffs to vouch for the legitimacy of NASI and their investments.  Each of these efforts to transaction business by the ATM Ponzi Scheme, including in New York, was intentional and critical to the concealment and continuation of the Scheme, as each of the participants in the ATM Ponzi Scheme well knew.

64.      By engaging in these acts, each of the participants in the ATM Ponzi Scheme, including CNB, engaged in affirmative acts of fraudulent concealment to further and cover-up the ATM Ponzi Scheme, and these acts operate to equitably toll and suspend any statutes of limitation that are applicable to any Plaintiff until a date no earlier than September 30, 2014,

when the Receiver filed the Receiver Action, or the date any Plaintiff learned of the Receiver Action, whichever is later.

## V.    AGENCY ALLEGATIONS

65.    At all times relevant hereto, Defendant CNB (through Fitzwilliam), Fitzwilliam, Saleh, Gillis, and Wishner were co-schemers (collectively, the "Co-Schemers") in the ATM Ponzi Scheme.  In that capacity each (a) was acting as the agent, servant, representative, partner, joint venturer, employee, instrumentality,  and co-schemer of each other and of the wrongdoers named herein, and, in committing the wrongful acts and omissions described herein, acted in concert with each other and within the course, scope, knowledge and purpose of that agency, representation, partnership, joint venture, employment, instrumentality, conspiracy or scheme; and (b) had advance knowledge of, agreed and intended to participate in, did knowingly participate in, the  events, acts, transactions, practices and courses of conduct described herein, and, in committing and permitting said acts and omissions, did cause, aid, abet, facilitate, encourage, authorize, consent, approve, permit, adopt and/or ratify the wrongful acts and omissions of the others,. conspired, schemed, collaborated, and colluded with each other, and upon information and belief others, to join, further, and conceal the ATM Ponzi Scheme, except Fitzwilliam did not collude with CNB but acted at all times as managing agent of, and on behalf of, defendant CNB.  Each Co-Schemer authorized or ratified the acts of each other in furtherance of the ATM Ponzi Scheme to steal and launder the money belonging to Plaintiffs and to conceal the ATM Ponzi Scheme.

66.    All of the acts of Fitzwilliam and other employees of CNB alleged herein were performed within the course and scope of their respective employment with CNB, were performed in the normal course of his employment and in furtherance of CNB's business, and used the employees, books, records, furniture, fixtures, telephones, computers and other instrumentalities of commerce owned and operated by CNB, including those acts of wrongful conduct in furtherance of the ATM Ponzi Scheme.  The acts of Fitzwilliam were performed in his capacity as an officer and employee of CNB, substantially within the time and space limits

authorized by CNB, were motivated in part by an intention to serve his employer, were of a kind and nature that he was hired and authorized to perform, were in part beneficial to CNB, and were ratified and affirmed by CNB until his suspension.  All of the acts of Saleh alleged herein were performed by her in the course and scope of her family business known as Bribet Services with the knowledge and consent of its co-owner, Fitzwilliam.   Salah and Fitzwilliam acted as principals and as the agents of each other.

67.     Defendants CNB is liable for the tortious acts of their employees, including without limitation all acts by Fitzwilliam in furtherance of the ATM Ponzi Scheme.

## VI.    INFORMATION ALLEGATIONS

68.     The allegations of this Complaint are made on information and belief and the documents of NASI and CNB so far obtained, except those allegations that pertain directly to the Class Representatives, which are based on their personal knowledge.   This information and belief is based on, among other things, the investigation conducted by Plaintiffs' attorneys.   The allegations and factual contentions in this complaint have evidentiary support or, alternatively, are likely to have evidentiary support after reasonable opportunity for further investigation or discovery by Plaintiffs or their counsel.   To date, Plaintiffs have had limited access to CNB's documents and to date, CNB has not yet produced all documents in its possession. Plaintiffs reserve the right to amend complaint to conform to proof as the facts are further developed.

69.      Allegations contained herein also are also based, in part, on the relevant allegations in the Interim Reports filed in the SEC Case by the Receiver, the pleadings filed by the Receiver in the Receiver Action, and the exhibits and declarations filed with the complaints in other actions.   Upon information and belief, the factual allegations in the Receiver's pleadings are based on his review and investigation, conducted over a period of more than two years, of NASI's business operations and the books and records in the Receiver's possession, and the allegations contained in the Receiver's pleadings related to NASI's business operations and interactions with CNB have evidentiary support.

### VII.   CNB AND THE ATM PONZI SCHEME OPERATORS CARRY OUT AND CONCEAL THE ATM PONZI SCHEME.

**A.      Fitzwilliam's Knowledge**

70.      Fitzwilliam and Saleh knowingly promoted, managed, carried out, participated in, and concealed the ATM Ponzi Scheme.

71.      Fitzwilliam and Saleh were not innocent victims of NASI and the ATM Ponzi Scheme, but acted with actual knowledge and intentionally.

72.      Fitzwilliam and Saleh were knowledgeable about fraudulent schemes like the ATM Ponzi Scheme, because among other things, Saleh had a prior history of sophisticated violation of investment fraud, and she was a sophisticated fraudster herself and an expert in stealing other people's money with the use of lies and fabricated customer account statements. Her prior experience made her highly qualified to understand the ATM Ponzi Scheme.  The state of mind and intent of Fitzwilliam and Saleh with respect to the ATM Ponzi Scheme was informed by their prior experience with fraudulent activities, particularly fraud by Saleh, and by the intimate knowledge that Fitzwilliam acquired by his intimate management of the NASI Accounts at CNB and his discussions with Gillis and Wishner.

73.      Saleh was employed as a licensed investment advisor from 1991 to 2001 at UBS PaineWebber ("UBS"), from 2001 to 2004 at Wachovia Securities ("Wachovia"), from November 2004 to June 25, 2009 at Wedbush Morgan Securities ("Wedbush").   While at Wedbush, Saleh, and her sister and co-worker Debra Michelle Saleh, were accused of, and permanently lost their licenses for, violating securities laws and engaging in deceitful practices in connection with the purchase or sale of securities, including without limitation falsifying documents, forging signatures, falsifying medallion stamp signature guarantees, mismarking tickets, destroying transaction documents (including fabricated documents), causing false entries on customer statements, and/or making misstatements or omissions directly to customers., when she was terminated for securities fraud and then permanently barred from the profession by

regulators for willfully violating securities laws.  The securities regulators found that  Saleh had engaged in

> (i)     forging her elderly clients' signatures on documents;
>
> (ii)    preparing fabricated account statements for the clients to conceal her prior thefts;
>
> (iii)   preparing fabricated documents to deter detection by her employers; and
>
> (iv)    destroying the fabricated documents.

74.    Furthermore, in order to evade the expected and/or resulting civil judgments as a result of this prior misconduct and to keep the money stolen in Saleh's securities fraud scheme, Fitzwilliam and Saleh had knowingly fraudulently transferred their assets, including on December 30, 2008, fraudulently conveying her residence to her father, and on March 11, 2009, executing an identical fraudulent conveyance of their personal residence to Saleh's father.  This history of substantial fraud supports that Fitzwilliam and Saleh, who was at that time a licensed investment advisor and an expert at defrauding her own clients, were sophisticated financial professionals, who, as early as 2006, when they began purchasing purported ATM's from NASI, were likely to recognize and know that NASI was conducting a fraud.  Certainly, by no later than 2009, after Fitzwilliam for several years closely managed and reviewed the NASI Accounts and the account activity, he and Saleh did in fact recognize and know that (a) the NASI ATM leaseback business was a form common to Ponzi schemes; (b) the Sale Agreements and Lease Agreements were part of a Ponzi scheme; and (c) the guaranteed minimum 20% return was impossible to obtain without the use of fraud.

75.    Based on all of these factors, Fitzwilliam recognized NASI's business as a Ponzi scheme.  In exchange for his silence and his knowing and substantial assistance in furthering and protecting NASI and its Accounts at CNB, Fitzwilliam "invested" or remained "invested" in the ATM Ponzi Scheme in order to achieve the fraudulent and inflated 20% returns.  Fitzwilliam's protection of the ATM Ponzi Scheme helped make his purported "purchase money" safe and

enabled him to quickly "cash out" if and when the scheme risked exposure.  He did in fact cash out.

**B.**     **Fitzwilliam and Saleh Secretly Buy 40 ATM Machines and Are Large Net Winners**.

76.     In the mid-2000s, Fitzwilliam took over management of the NASI CNB Accounts.  On or about November 17, 2006, Fitzwilliam responded to a request by Gillis to stop payment on a lost check written by NASI to an investor that had been made from the CNB Investors Account (defined below).  At about this same time, Fitzwilliam also asked Gillis for permission to purchase ATM's from NASI and told Gillis that he would buy the ATM's only if Gillis agreed to keep Fitzwilliam's personal financial involvement secret from CNB.  Although Gillis could have rejected this request and the potential heightened scrutiny if the branch manager's own money was at risk, in which case Fitzwilliam would have had to disclose his purchase to CNB and delegate to other CNB employees the oversight of NASI's accounts at CNB, Fitzwilliam wanted to maintain this oversight of the Accounts in order to protect his own investment.

77.     Fitzwilliam recognized and admitted to Gillis the "conflict of interest" that Fitzwilliam had in overseeing NASI's accounts for the bank while simultaneously owning ATM's.  Gillis believed that that ultimately Fitzwilliam's interest in protecting his investment would outweigh his duty to oversee the accounts properly and would work to NASI's advantage.  Although Fitzwilliam had simultaneous access to the internal NASI investor documents and NASI's CNB bank records, Gillis agreed to Fitzwilliam's request to conceal the existence of the relationship.

78.     In the winter of 2006, Fitzwilliam, and Saleh took steps to purchase secretly ATM machines from NASI as investors in order to earn the minimum 20% return on their money. On or about January 12, 2007, Fitzwilliam and Saleh established and recorded the husband & wife business name of Bribet Services. To avoid CNB detecting Fitzwilliam's investment in a customer of the bank, and to hide their participation in the ATM Ponzi Scheme from other CNB management, Fitzwilliam and Saleh, using Bribet Services as the purchaser, entered into Sale

and Lease  Agreements with NASI for the purchase of three tranches of ATM's: the first on November 27, 2006 ("Tranche 1"), the second on June 1, 2007 ("Tranche 2"), and the third on July 1, 2008 ("Tranche 3").  Each tranche was comprised of 10 ATM's priced at $12,000 per machine, for a total price of $120,000 per tranche, and a total investment in these tranches of $360,000.  See Exhibit ML-15.  Copies of the certified checks used to pay for their first three tranches are contained in Exhibit ML-6 at pages 194, 200, and 206.

79.     Using Bribet Services as the purchaser avoided the possibility that CNB would see Fitzwilliam's name on checks to and from NASI.  Fitzwilliam further disguised his purchases by using certified checks instead of personal checks.  Fitzwilliam also obtained Gillis's promise that NASI would keep the investment secret from CNB.   Furthermore, in and about January 30, 2014, Fitzwilliam instructed NASI to remove Fitzwilliam's name from the "c/o" for Bribet Services on the labels used for mailing the monthly rent checks and monthly reports.

80.     In June, 2009, Fitzwilliam and his wife came under great financial stress and jeopardy.  On June 25, 2009, Wedbush fired Saleh, while creditors were asserting claims against her, and Wedbush unilaterally froze the accounts of Saleh and Fitzwilliam at Wedbush, which contained their cash and cash equivalents, and other investments.  These events exacerbated Fitzwilliam's need for money and his desire to further protect assets already acquired.  The stress was so significant, that Fitzwilliam and Saleh made fraudulent transfers of assets without consideration in an attempt to place the assets beyond the reach of creditors.

81.     On June 20, 2009, in exchange for his continuing to allow NASI to collect and disburse stolen funds through the CNB accounts, Fitzwilliam entered another ATM Sale Agreement with NASI to buy ten more ATM machines (Tranche 4) for $120,000, again with the guaranteed 20% return.  Although the Tranche 4 documents show that NASI acknowledged receipt of a $120,000 deposit from Bribet Services to pay for Tranche 4, Fitzwilliam and Gillis agreed that this $120,000 payment would be made by Fitzwilliam's father-in-law, Gensar Saleh, as Trustee of the S&J Agreement of Trust.  For Tranche 4, Fitzwilliam made the $120,000 payment using the name Gensar Saleh (Betty Saleh's father), as Trustee of the S&J Agreement of

Trust.  On July 9, 2009, NASI deposited these funds at CNB, and Fitzwilliam approved.  Bribet Services paid no consideration for the ten ATM's in Tranche 4, and NASI did not convey any consideration to the S&J Agreement of Trust in exchange for the $120,000, Rather, Fitzwilliam requested and Gillis consented that every monthly "rent" payment due for the ten mini-mart ATM's in Tranche 4 actually be paid to Bribet Services, as reported in the Investor Summary Reports.  The $120,000 was transferred by a trust to NASI for the benefit of the owners of Bribet Services in order to conceal the source of funds from creditors of Fitzwilliam and Saleh.

82.    The $120,000 transfer was a special accommodation by NASI to Fitzwilliam based on his request but was void for lack of consideration. The transfer also breached Paragraph 8 of the standard form ATM Lease Agreement (See Exhibit ML-4, page 52) because the lessors (Fitzwilliam and Saleh doing business as Bribet Services) had to warrant to NASI that they were the owners of the leased ATM's and the ATM's were free and clear of all interests and claims. NASI, Gillis, Wishner, Fitzwilliam and Betty Saleh all knew this warranty of ownership was false, because they all knew that the owners of Bribet Services did not pay for the machines. NASI accepted the at-risk money ostensibly held in trust to pay for machines not held in trust as an accommodation to Fitzwilliam to continue to obtain CNB's assistance in covering up and furthering the ATM Ponzi Scheme.

83.    Thus, no later than June 2009, Fitzwilliam knew that (i) NASI was a ATM Ponzi Scheme using his CNB branch to perpetuate the scheme; (ii) the family's $360,000 investment in NASI was at serious risk of loss if someone detected or exposed the scheme; and (iii) the ATM Ponzi Operators were willing to financially accommodate Fitzwilliam in exchange for Fitzwilliam's ongoing silence and CNB's ongoing assistance.

84.    On September 21, 2009, however, the *Wall Street Journal* published an article, and other news sources reported, about the arrest of two men in North Carolina charged with running a massive $80 million Ponzi scheme involving fake investments in non-existent ATM machines, purported sale and leaseback agreements, and fabricated account statements, a scheme similar to the NASI ATM Ponzi Scheme.

85.     Gillis and Wishner discussed the article and the North Carolina scheme just prior to Fitzwilliam selling back 20 machines to NASI in late October 2009.  Upon information and belief, Fitzwilliam and Saleh, were concerned by the widespread exposure and attention in the national news about the North Carolina scheme.  Because of this and other matters, Fitzwilliam became more concerned that the ATM Ponzi Scheme would be exposed, and he began to take steps to cash out by having NASI buy back ATM's.  He did not, however, stop his efforts to further the ATM Ponzi Scheme and injure Plaintiffs.

86.     On or about October 26, 2009 (only 4 months after Fitzwilliam bought the ten Tranche 4 ATM's with a two-year resale restrictions), Fitzwilliam and Saleh demanded that NASI buy back the 20 phantom machines they had  acquired on November 27, 2006 (Tranche 1) and June 1, 2007 (Tranche 2).  NASI promptly complied.  Within a week, NASI paid them by $240,000 check to Bribet Services using proceeds of the ATM Ponzi Scheme.  The $240,000 payment cleared NASI's account at CNB on November 2, 2009, under Fitzwilliam's observation.

87.     NASI's payment of the entire $240,000 in one check was another accommodation by NASI to Fitzwilliam to induce and reward his actions in causing CNB to aid and abetting the ATM Ponzi Scheme. NASI's standard practice was to pay investors who sold back their machines back to NASI in three installments and not all at once.

88.     Fitzwilliam's purchase of a fourth restricted tranche for $120,000 while simultaneously selling back two prior unrestricted tranches for $240,000 had no legitimate business justification, and was done because Fitzwilliam felt undue risk when he saw the Wall Street Journal article and decided to reduce his exposure in the Ponzi Scheme.

89.     In order to protect Fitzwilliam's principal investment in the Tranche 4 ATM's in exchange for his causing CNB to continue aiding and abetting the Ponzi Scheme, at Fitzwilliam's direction, NASI wrote (and Wishner signed) two checks for Fitzwilliam's benefit in order to buy back the Tranche 4 ATM's.  On February 12, 2012, it gave him a check for $60,000 payable to the S&J Agreement of Trust.  At the time of the February 12, 2012 check,

Fitzwilliam provided NASI a promotional letter on CNB letterhead. Exhibit ML-16.  On August 6, 2014, on the eve of the collapse of the Ponzi Scheme, and just before August 22, 2014, when higher officials at CNB directed Fitzwilliam to terminate NASI as a client of the bank, NASI gave Fitzwilliam for $60,000 payable to Gensar Saleh (not in a capacity of a trustee).  Exhibit ML-24.

90.    Bribet Services continued to receive "rent" payments from NASI stolen from Plaintiffs on the Fitzwilliam's remaining ATM's until August of 2014, when CNB finally terminated its banking relationship with NASI and the ATM Ponzi Scheme collapsed a month later.

91.    Each of these "buyback" payments was for Fitzwilliam's benefit and was made with funds that Fitzwilliam knew were stolen from other investors.

92.    NASI's agreement to pay this last $120,000 to re-purchase 10 ATM's was a very special accommodation to Fitzwilliam.  In August 2014, NASI's ATM Ponzi Scheme collapsed after another CNB manager filling in for Fitzwilliam while he was absent from the bank, refused to provide funds to NASI to cover for insufficient funds, as Fitzwilliam had always done.  When the checks started bouncing, investors panicked and inundated NASI with requests for new checks and requests to sell their ATM's back to NASI.

93.    On August 6, 2014, alone NASI received roughly 1,800 telephone calls from investors.  See page 1066 of ML-25.  NASI attempted to calm the investors, but uniformly refused to buy back the investors' ATM's.   NASI did not have funds to buy back thousands of ATM's, and NASI was using all available money to cover the bouncing checks.

94.    In the midst of this chaos, NASI made one very special exception for Fitzwilliam and agreed to his request to sell ATM's back to NASI.  On the very same day that NASI was fielding roughly 1,800 investor calls and scrambling to cover the bouncing checks, NASI, at Fitzwilliam's request, wrote the $60,000 check to Fitzwilliam's father-in-law, Gensar Saleh, to buy back 10 ATM's. This check cleared the account on August 11, 2014.  See ML-13 check number 13426 and ML-23, page 1026.

95.     Over time, in exchange for their substantial investment with NASI, and Fitzwilliam's silence and knowing assistance to NASI as a senior manager of CNB, Fitzwilliam received substantial payouts from the stolen money in NASI's Accounts at CNB.  All, or substantially all, of these payments were received after Fitzwilliam and Saleh knew that this was a fraudulent ATM Ponzi Scheme.  As a result, Fitzwilliam made over $250,000 as a planned net winner.

**C.      Fitzwilliam Furthered the ATM Ponzi Scheme Through His Unfettered Access to, and Use of, the Three (3) NASI Accounts at CNB to Further the Fraud, By Which He Also Gained Further Knowledge of the Fraud.**

96.     From November 2006 to June 2009, Fitzwilliam became familiar with NASI's business model and the terms of its contracts with investors. Each month Fitzwilliam received the Investor Summary Reports along with the "Investor Account" rent checks paid to Bribet Services.

97.     From June 9, 2007 to May 5, 2009, as an investor, Fitzwilliam also received in the mail the notices sent by NASI to "All Investors".  These notices identified additional buying opportunities. The notice sent on May 5, 2009, promoted the sale of 4,000 ATM's owned by NASI to be installed in mini-marts instead of hotels.  Fitzwilliam responded to this notice by buying 10 mini-mart machines from NASI on June 30, 2009.

98.     Soon after Fitzwilliam acquired the ATM's, he realized that NASI did not appear to have a source of income flowing into the NASI CNB Accounts from actual ATM revenue rather than from internal transfers from the NASI CNB Accounts and further investor purchases of ATM's.  The CNB Accounts only showed income into the General Account from the further alleged sales of ATM's and no outside income into any account.  By the end of January 2008, Fitzwilliam knew or had information that 218 investors had deposited $9,008,500 into the "General Account" in January 2008 but the ATM service providers had only deposited 3 checks totaling $106,940 into the same account.   This disparity and other similar disparities between the deposits from investors and the deposits from service providers caused Fitzwilliam to ask Gillis and Wishner: "where is the money?"   "There must be other money" coming in from the rental of

the thousands of ATM's.  Wishner then admitted to Fitzwilliam, "that NASI had no other bank accounts or other money beyond that on deposit at CNB."  Exhibit 1, Wishner Decl.  ¶18.

99.     Thus, whether or not Fitzwilliam knew from his first investment in 2007 that this was an ATM Ponzi Scheme, Wishner's critical admission to Fitzwilliam proved to him that the ATM Ponzi Operators were operating the ATM Ponzi Scheme by selling non-existent ATM's. However, because Fitzwilliam had purchased his machines without telling CNB, Fitzwilliam chose to further and protect the ATM Ponzi Scheme rather than disclose it to CNB, because he could not do so without revealing his own misconduct to CNB, and because that would result in the loss of Fitzwilliam's own investment, when the ATM Ponzi Scheme collapsed from such a disclosure.

100.     Wishner's admission to Fitzwilliam of the fraud supplemented Fitzwilliam's knowledge of the fraud acquired from his operation of the Accounts and the absence of evidence in these Accounts of other monies being transferred into or out of NASI's CNB Accounts from other bank accounts held by NASI.

101.     Thus, Fitzwilliam knew from his close review and knowledge of the contents of NASI records at CNB that Wishner's admission was true: there was "no other money," and this was a Ponzi scheme. As set forth below, Fitzwilliam had (i) possession of NASI internal documents not possessed by investors, and (ii) unfettered access and use of NASI's financial information contained in the three NASI Accounts at CNB: the General Account (#4110), the Investors Account (#4399), and the Locations Account (#4402).

 Access to these three Accounts, combined with other facts, revealed important information. First, NASI was just recycling and laundering investor purchase payments from the General Account into the Investors Account in order to make lulling payments pretending to be rent payments.  Second, NASI never paid for the thousands of ATM's it had allegedly bought  before selling them to investors, because there were no payments in the Accounts for the thousands of fictitious machines sold.  Third, there were no payments to lease space at the thousands of locations that would have had to exist if NASI had placed all the machines that it was allegedly

leasing from investors. Rather the Accounts only showed far smaller payments for renting space for 250 machines. The bank records revealed that NASI never paid for the thousands of ATM's it had to buy before selling them to investors. NASI simply had no meaningful "costs of goods" that it was allegedly selling. These facts are clear from even a cursory look at NASI's CNB bank records. Either (i) NASI owned thousands of ATM's without locations, or (ii) NASI was committing fraud by selling non-existent machines.

102.     Fitzwilliam's knowledge of the activity and purpose of the Accounts came from exercising his normal duties as an officer of CNB and not from exercising any special regulatory or investigative duties or functions.

**1.      The General Account**

103.     The General Account was used to receive purchase payments from Plaintiffs, when they purchased their ATM's from NASI. Fitzwilliam's knew this, because in July 2009 he approved the $120,000 deposit of his family money into the General Account to buy 10 more ATM's. Exhibits ML-11 and ML-12.

104.     Fitzwilliam also knew this, because he frequently dealt with NASI investors, who had stopped payment on their checks to buy ATM's and with investors' checks that had been returned for insufficient funds. From January 2008 to August of 2014, over 50 investor deposit checks totaling over $3 million did not clear the CNB Accounts. Except for Fitzwilliam's intervention, this would have caused significant concern at CNB. Fitzwilliam and NASI had extensive email correspondence concerning these bad checks. Exhibit ML-10 at pages 685, 686, 694, 695, 698, 700, 702, 705, 706, 713, 714, 715-717, 758, and 784-786. For example, on page 716, Fitzwilliam attached a deposit slip for $995,020 of investor funds into the General Account and included a copy of a bad check from Bryan Anthony for $60,000, which like most investor checks, identified that the purpose of the check was to "Purchase" ATM's. Fitzwilliam's own certified check dated November 25, 2006, stated it was for the purchase of "*10 Machines*." Exhibit ML-6, page 206. Thus, no later than 2009, Fitzwilliam knew that NASI used the General Account to deposit checks from investors buying ATM's from NASI.

105.    NASI used three service providers to service NASI's real ATM's, who paid NASI a percentage of the transaction fees they received each month.  NASI deposited these payments into the General Account.  While there were deposits of genuine income into the General Account, these deposits were relatively insignificant. From 2009 to 2014, monthly deposits into the General Account by these three processors were only about $150,000 per month.  Thus, there really was no "other money."

106.    In comparison, NASI bank statements for the General Account at CNB for representative months of June 2009-2014 reflect 9 deposits in June 2009 of $5,108,920.62 (page 228);  7 deposits in June 2010 of $2,418,446.96 plus $275,990 in 2 wire transfers (page 233); 10 deposits in June 2011 of $6,028,032.46 (page 237); 9 deposits in June 2012 of $4,367,701.85 plus $167,975 in wire transfers (page 241); 11 deposits in June 2013 of  $7,822,096.15 (page 246); and 11 deposits in June 2014 of $6,317,766.29 plus a $99,000 wire transfer and a $756,000 "credit adjustment."   Exhibit ML-8.1, pages 228 to 255.  There was a similar flow into NASI from investors during most if not all months during 2006-2014, while Fitzwilliam was managing the General Account.

107.    In addition to Fitzwilliam seeing the monthly flow of money into the General Account, as an investor, he also received in the U.S. mail with his rent checks, NASI newsletters and Investor Summary Reports sent to all investors. Exhibit ML-25.  The notices to investors, including Fitzwilliam, claimed that NASI was allegedly buying thousands of ATM's to sell.

108.    NASI also used the General Account to make transfers to other CNB accounts (the "Investors Account" (#4399) and the "Locations Account," (#4402) discussed below) and to pay back investors, who elected to resell their machines to NASI.  From this, Fitzwilliam knew that NASI used the General Account to pay refunds to investors, and, in fact, on or about November 2, 2009, he received and cashed a check for $240,000 out of the General Account. Exhibit ML-7, page 223.

109.    Fitzwilliam could see the pattern of repeated transfers (i) from the General Account to Investors Account in June of 2010 to cover NASI's lulling "rent" checks sent from

the Investors Account to pay investors in order falsely to create the appearance that NASI was paying them rent on thousands of machines; and (ii) from the General Account to the Locations Account to pay various business, which housed the (approximate) 250 actual ATM's owned by NASI.  Exhibit ML 8.1, pp. 234-35.  But absent from Exhibit ML-8.1 are any payments from the General Account to acquire the thousands of ATM's, which NASI had allegedly bought and then sold to the victims.  Thus, there is no evidence in any Account of the costs of purchasing the alleged thousands of ATM's that that were necessary to the operation NASI was allegedly running.

> **2.  The Locations Account**

110.    NASI used the "Locations Account" to make monthly payments to each business location that hosted a real ATM.   Each location received one check.

111.    The CNB monthly summary statements for the Locations Account for the months June 2009-2014, Exhibit ML-8.3, showed Fitzwilliam that NASI wrote only 244 checks to 244 locations for 244 real ATM's in June 2009 (page 444); 263 checks written to 263 locations for 263 real ATM's in June of 2010 (page 462); 259 checks written to 259 locations for 259 real ATM's in June 2011 (page 472); 216 checks written to 216 locations for 216 real ATM's in June 2012 (page 482); 195 checks written to 195 locations for 195 real ATM's in June 2013 (page 487); and 196 checks written for 196 locations for 196 real ATM's in June 2014 (page 492).

112.    Thus, Fitzwilliam knew that while NASI was selling thousands of purported machines to investors from 2009 to 2014 (Exhibit ML-25), there were no corresponding checks making payments to the business at the locations that were allegedly housing these ATM's.   In fact, the number of locations checks declined slightly while the amount paid each month to the locations to house the machines remained constant, averaging approximately $75,000 per month for the month of June from 2009 to 2014.

113.    Fitzwilliam knew the existence, purpose, and activity of the Locations Account, because he personally approved of hundreds of bridge loans to NASI to "cover" the payment of checks that NASI wrote from the Locations Account when it had insufficient funds. See, for

example, Exhibit ML-9, pages 607-617, 621-638, 640-646, 648-649 and 653-654.  Indeed, as Wishner stated in his declaration ¶19, in August 2014, the ATM Ponzi Scheme collapsed from within, simply because Fitzwilliam was unavailable to authorized and pay checks written when there were insufficient funds.  Instead, an honest CNB regional manager was present and stamped the checks "Returned," thus ending the scheme by refusing Wishner's pleas for liquidity.  In contrast, Fitzwilliam had furthered the ATM Ponzi Scheme for years by meeting these constant requests to cover insufficient funds, thus keeping the ATM Ponzi Scheme alive and insuring payments to Fitzwilliam. Exhibit ML-9, pages 502-522 and 547-561.

114.    Fitzwilliam had access to the checks written out of the Locations Account, and each check identified the address of the location which housed the real ATM's owned by NASI. As set out in ¶11 of Exhibit ML-4 on page 52, all of the NASI investors, including Fitzwilliam, were contractually precluded from contacting the locations where their ATM's were installed to see if the machines were actually installed as represented by NASI.  Fitzwilliam, however, knew the locations where his ATM's were supposed to be located, installed and operational, because that information was contained in his monthly Investor Summary Reports (Exhibit ML-5) and in the Exhibits "A" to his lease contracts with NASI as set out in his Investor File which is Exhibit ML-6 at pages 193, 220, 221 and 222.

115.    Fitzwilliam was the only NASI investor who had access to the actual Locations Account checks. Thus Fitzwilliam was the only NASI investor who could compare the location addresses contained on those real location checks to the location addresses identified in his individual Investor Summary Reports or the Exhibits "A" to the lease agreements. Because Fitzwilliam had both the locations on the Locations Account checks and the locations identified in Fitzwilliam's Investor Summary Reports, Fitzwilliam knew that there were no payments being made to any locations which allegedly housed his 40 machines.

3.    **The Investors Account**

116.    NASI used the Investors Account exclusively to make monthly "rent" payments to the "investors" to accompany their individual itemized Investor Summary Reports.

Fitzwilliam knew about the Investors Account, because he personally received close to 100 checks from NASI from this account to pay the monthly rent for his 40 ATM's. Exhibit ML-14, pages 805 to 833.

117.    CNB statements for the Investors Account for representative months June 2009, 2010, 2011, 2011, 2012, 2013 and 2014  (Exhibit ML-8.2 at pages 257 to 441) show that NASI paid the following amounts to investors: June 2009,  $1,731,590 to 811 investors (page 258); June  2010,  $2,518,934.75 to 990 investors (page 311); June 2011,$3,326,162.25 to 1,201 investors (page 339); June  2012, $4,480,002.04 to 1,458 investors (page 372); June 2013,$6,192,068.88 to 1,871 investors (page 412); and June 2014, $8,722,836.76 to 2,381 investors (page 426).

118.    Thus, the number of investors tripled from 811 in June 2009 to 2,381 in June 2014, and the fictitious rent paid to investors increased fourfold from $1,731,590 in June 2009 to $8,722,836.76 in June 2014. The actual rent received from the three ATM processing companies for NASI's real ATM's, however, stayed relatively the same over time as did the number of locations checks written by NASI each month to pay to house its real ATM's.

119.     Fitzwilliam received payments directly from the Investors Account, and he knew about the financial information contained in the Investors Account.  After he became an investor, from November 2006 until August 2014, Fitzwilliam approved as "Paid" hundreds of bad checks written by NASI out of the Investors Account. Exhibit ML- 9 at pages 573, 586, 596, 599-606, 618, 620, 622, 639, 647, 650-652, 655-658 and 660-663.   Indeed, just as he did with the Locations Account, Fitzwilliam balanced the Investors Account for NASI and provided bridge loans to the ATM Ponzi Operators.   Thus, he knew of the fraud and provided substantial assistance to the ATM Ponzi Scheme to keep it going and cover it up.

120.    Fitzwilliam's cover-up was no small project. Exhibit ML-9, reflects 179 *pages* of overdraft notices, pp. 497 - 675.  The last 24 pages alone reflect over 200 checks paid by CNB requiring overdraft advice to NASI that there were insufficient funds in the accounts to cover NASI's checks.

### 4.      Comparing the Investors Account with the Locations Account

121.      The disparity between the "rent" checks and the location checks was vast and grew immensely.  From 2009 to 2014, Fitzwilliam knew that the number of "rent" checks paid to investors summarized in the Investors Account vastly exceeded the number of checks reflected in the Locations Account to pay for the actual machines owned by NASI: three times as many in 2009 and twelve times in 2014. The disparity was even more compelling because the location checks were written to cover only one machine and the investors' checks were written to investors who owned multiple machines. Fitzwilliam knew this, because he owned up to 40 machines and received one rent check each month for the purported transactions that took place at his 40 machines. Exhibits ML- 5 and ML-14.

122.      This disparity is also obvious from comparing the length of the account summary statements prepared each month by CNB (Exhibit ML-8.2, pages 264-309; (45 pages of 811 investor checks in June 2009) with Exhibit ML-8.3, pages 447-460 (13 pages of 244 location checks in June 2009).

123.      The following table compares January of each year from 2008 to 2014.

| Year | Month | **Payments to Investors From #4399** | | | | **Payments to Locations From #4402** | | |
|------|-------|----------------------------------|--|--|--|----------------------------------|--|--|
| | | # of checks is number of investors | Amount paid to Investors for the month of Jan. | Average amount of check | # of checks is number of real ATM's | Amount paid to Locations for month of Jan. | Average amount of checks |
| **2008** | January | 589 | $ 1,311,724 | $ 2,227 | 94 | $ 72,893 | $ 248 |
| | | | | | | | |
| **2009** | January | 762 | $ 1,675,018 | $ 2,198 | 50 | $ 89,423 | $ 255 |
| | | | | | | | |
| **2010** | January | 885 | $ 2,042,977 | $ 2,308 | 60 | $ 77,096 | $ 297 |
| | | | | | | | |
| **2011** | January | 1060 | $ 2,903,647 | $ 2,739 | 74 | $ 77,957 | $ 285 |
| | | | | | | | |
| **2012** | January | 1327 | $ 3,943,624 | $ 2,972 | 39 | $ 56,960 | $ 238 |
| | | | | | | | |

| 2013 | January | 1669 | $ 5,465,032 | $ 3,274 | 46 | $ 94,379 | $ 384 |
|------|---------|------|-------------|---------|----|----------|-------|
|      |         |      |             |         |    |          |       |
| 2014 | January | 2208 | $ 7,914,300 | $ 3,584 | 66 | $ 83,395 | $ 314 |

### 5. Fitzwilliam Compared the General Account Deposits from Investors with the Deposits from ATM Service Providers.

124. It was easy for Fitzwilliam to distinguish between deposits from investors and deposits from income coming from service providers for legitimately placed, actual ATM's.

125. Most of the investors (except Fitzwilliam, who paid with cashier's checks) paid for their ATM's with a personal check. Many of the checks deposited in the General Account indicated on the face that it was for an ATM sale and leaseback investment. See Fitzwilliam's email to Wishner and Gillis at Exhibit ML-10, page 715-716. Furthermore, NASI only sold ATM's to investors at two price points: typically $12,000, but also $19,800 per ATM. As a result, the dollar amount of each deposit of new investor funds was always some multiple of one price or the other. More often than not, the amount was also identical to that of numerous other deposits on the deposit slips approved by Fitzwilliam. Exhibit ML-10, page 716 and Exhibit ML-12, page 802.

126. Exhibit ML-12 contains a copy of a July 9, 2009 NASI deposit slip at CNB with the approval notation that the "checks (are) within Brian's limits largest CK $120,000." As discussed later, the check identified as number 12 on the slip for $120,000 was deposited by "Brian" for the benefit of Brian Fitzwilliam. Thus, Fitzwilliam knew about and approved of deposit of his own money. The seventeen checks from investors identified in Exhibit ML-12 total $738,600, and they are all divisible by $12,000 or $19,800. This fact was common for the receipt of investor money.

127. On the other hand, the amount of revenue received by NASI from service providers for legitimate ATM transactions from its 250 real machines was insignificant, varied from month-to-month, and came in uneven deposits from three corporations. The monthly checks from Cardtronics and the other two service providers lacked any semblance of the pattern

and uniformity evident in deposits of new investor funds.  Unlike deposits of investor funds, deposits of income from real ATM's was in the form of a monthly check written in the name of an entity suggestive of the business it conducted.  But there were only three service providers. NASI deposited payments received from those three companies on a monthly basis.  Recurring monthly deposits of payments received from only these three entities caused real ATM revenue to stand out in NASI's account records, and differentiated it from money remitted by the multitude of unique NASI investors.

128.   In addition to these qualitative differences, the amounts deposited into the General Account by the investors versus the low amounts from ATM service providers showed Fitzwilliam that the investors' ATM's did not exist.  An annual and monthly comparison of large investor deposits into the General Account versus small deposits by the three ATM service providers from 2008 to September 2014 is set out below:

**Investor Deposits**                **ATM Servicer Deposits**

| Year | General Account #4410 | Number of Checks Received | Amount of Checks | Avg. Amount per Check | | Number of checks Received | Amount of Checks | Avg. Amount per Check |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| **2008** | January | 18 | $ 9,008,500 | $ 41,323 | | | $ 106,940.00 | $ 35,647 |
| | Annual | | $ 29,174,363 | | | | $ 1,707,580.00 | |
| | | | | | | | | |
| **2009** | January | 2 | $ 180,000 | $ 90,000 | | | $ 136,762 | $ 45,587 |
| | Annual | | $ 23,986,196 | | | | $ 1,682,456 | |
| | | | | | | | | |
| **2010** | January | | $ 4,583,300 | $ 89,869 | | | $ 180,889 | $ 45,222 |
| | Annual | | $ 39,215,623 | | | | $ 1,656,553 | |
| | | | | | | | | |
| **2011** | January | 1 | $ 3,901,050 | $ 48,161 | | | $ 184,696 | $ 46,174 |
| | Annual | | $ 47,534,670 | | | | $ 1,733,043 | |
| | | | | | | | | |
| **2012** | January | 4 | $ 8,315,700 | $ 88,465 | | | $ 167,379 | $ 33,476 |
| | Annual | | $ 63,606,313 | | | | $ 1,567,975 | |
| | | | | | | | | |
| **2013** | January | 5 | $ 5,754,356 | $ 60,572 | | | $ 149,250 | $ 49,750 |
| | Annual | | $ 88,069,696 | | | | $ 1,471,992 | |
| | | | | | | | | |

| 2014 | January | 28 | $ 6,689,645 | $ 52,263 | | | $ 94,448 | $ 47,224 |
|------|---------|-----|-------------|----------|--|--|-----------|-----------|
| | Annual | | $ 59,880,220 | | | | $ 790,810 | |

129.    As reflected in the tables above, NASI's actual ATM income from ATM's represented a tiny fraction - less than 2% in 2013 - of its total deposits at CNB, and its "income" was 98% Ponzi scheme from new investors.  In 2009, this same figure was 94%. As a result, payment of purported "rent" to investors invariably vastly exceeded the monthly deposits of actual income from ATM use.  For example, in January 2009, NASI received $136,762 in three payments from the ATM services for real ATM's, but NASI issued 762 checks for$1,675,018 to pay fictitious "rent" to its investors. In all instances the disparity between rent revenue and rent disbursements was immense. In April, May and June of 2014,, NASI paid investors "rent" of approximately $23.5 million, deposits of income from legitimate ATM's was only approximately $390,000.This shortfall occurred each month and the account statements showed Fitzwilliam that money from new investors was the real source to pay old investor the "rent" on their machines, – a Ponzi scheme.   These facts were clear from even cursory inspection of NASI's account activity.

130.    Because the ATM Ponzi Operators and Fitzwilliam agreed to conceal his purchase of ATM's from CNB, and Fitzwilliam worked to help NASI further the fraud, NASI did not take any steps after November 2006 to further hide the ATM Ponzi Scheme from CNB. NASI did not need to use typical Ponzi scheme devices such as placing investor funds in accounts at other banks or transferring funds between shell companies to obscure the origin.

131.    Thus, in November 2006 but no later than June 2009, CNB had actual knowledge, through Fitzwilliam, that it was aiding and abetting the ATM Ponzi Scheme by collecting and disbursing fraudulently obtained funds, lulling investors, and covering up the fraud.  Plaintiffs who purchased ATM's from NASI after Fitzwilliam's fraud began and who suffered a net loss are included in the Class.

**D.      Fitzwilliam Further Aids, Abets, and Conceals the ATM Ponzi Scheme.**

132.    Through a series of acts set forth below, Fitzwilliam, and thus CNB, performed multiple additional acts as co-schemers, all of which furthered and concealed the ATM Ponzi Scheme.

**1.      CNB Covers Shortfalls in the CNB Accounts.**

133.    On December 3, 2009, one month after Fitzwilliam received the $240,000 to sell the Tranche 1 and Tranche 2 machines back to NASI, Fitzwilliam sought to cash a $7,307.50 "rent" check from NASI payable to Bribet Services even though he knew that NASI's Account had insufficient funds to pay all of the pending rent checks.  Fitzwilliam and/or other CNB employees used irregular banking procedures to cover the check to Bribet so that it would clear despite insufficient funds.

134.   Upon information and belief, Fitzwilliam and CNB covered hundreds, if not thousands, of insufficiently funded payments to investors during the life of the ATM Ponzi Scheme.  During the November 2006 to June 2009, Fitzwilliam dealt with hundreds of bad checks written by NASI out of the Locations Account and Investors Account.  Fitzwilliam caused CNB to provide constant liquidity to NASI by loaning money to NASI to cover overdrafts.  This is not a customary banking practice, and this assistance to NASI reflects Fitzwilliam's personal attention to the Accounts and his personal relationship with NASI. Indeed, Fitzwilliam was so involved in the details that in 2008 and 2009, that he counted each $0.50 transaction for his 30 machines and made repeated facsimile demands on NASI to honor its 20% guarantee.

**2.      CNB Intentionally Disregards Red Flags and Conceals the Scheme.**

135.    Fitzwilliam provided false information about the number, location and ownership of NASI's ATM's to avoid inquiries that would detect the ATM Ponzi Scheme. Fitzwilliam and CNB further concealed the existence of hundreds, if not thousands, of bounced checks written by NASI and executed other atypical transactions. Even after June 2014, when the SEC began an

inquiry of CNB concerning the NASI Account documents, CNB continued to process NASI transactions for another two full months.

136.    As a result, Fitzwilliam furthered the operation of the ATM Ponzi Scheme through CNB Accounts and to allow the outflow of millions in investor funds.

### 3.    CNB Misrepresents the Legitimacy of NASI to Existing and New Investors, including Many Plaintiffs.

137.    From time to time, in furtherance of the Ponzi ATM Scheme, NASI often directed existing and potential investors, including many Plaintiffs, to contact Fitzwilliam at CNB to inquire about the standing and legitimacy of NASI.  Exhibits 2, 4, Decls. of Currie and Wilson. When Fitzwilliam received these inquiries, he orally and in writing vouched for the integrity and legitimacy of NASI and its methods of doing business, verified to these persons that NASI was a trustworthy and valued customer of CNB, represented the purported amount of NASI's account balances, and affirmatively stated that NASI had no banking problems. Many, if not all, of the vouching statements that Fitzwilliam made were false.

138.    In doing so, Fitzwilliam furthered and affirmatively concealed the ATM Ponzi Scheme and ensured its continued existence and liquidity to make "rent" payments to him and others, by helping to convince existing investors to remain and not cash out and convince new investors to purchase ATM's.

139.    Upon information and belief, Fitzwilliam represented to an investor that he had reviewed NASI's accounts, and that NASI was in fact receiving monthly rental income of close to $1 million each month from the thousands of machines that it owned, when in fact he knew that the Account records revealed that NASI's true rental income was only a small fraction of its monthly deposits at that time, and that machines did not exist.

140.    For example, on February 14, 2012, at NASI's request, Fitzwilliam wrote a letter, which contained false facts, but which Gillis disseminated in promotional packets to potential NASI investors to induce them to invest money in the ATM Ponzi Scheme.  Exhibit ML-16. Fitzwilliam wrote this letter on behalf of CNB at or about the same time NASI bought back

ATM's from him and paid the first $60,000 installment to Gensar Saleh, as the Trustee of the S&J Agreement of Trust.  Fitzwilliam wrote similar letters for NASI's use at other times.

141.    Fitzwilliam's letter, addressed "To Whom it May Concern," stated that NASI was a valued client of CNB and had been one since 1996.  The promotion letter, relied upon by many NASI investors, said that NASI maintained average balances of over $4,000,000 in the NASI operating account at CNB. The representations in the letter were false, and Fitzwilliam knew they were false.

142.    NASI was not and had never been a valued client of CNB.  Among other things, Fitzwilliam knew the average balance of $4 million in NASI's accounts was stolen money and the proceeds of a Ponzi Scheme, and that money deposited by investors and not service providers collecting rent on the thousands of ATM's was being used to pay the 20% return in the form of "rent" payments.  Fitzwilliam also knew that NASI posed a serious threat to the financial well-being of CNB, and that he was supposed to monitor NASI.

143.    In addition, Fitzwilliam's letter promoting NASI failed to include information known by him that would have made his statements not false and misleading, including among other things:

       (i)     NASI's business model consisted promoting a ATM Ponzi Scheme;;

       (ii)    NASI accepted a check for $120,000 from a third party, and, without any supporting documentation, allocated 10 ATM's to Fitzwilliam's Bribet Services which did not pay for the machines;

       (iii)   On or about October 26, 2009, Bribet Services sold back to NASI 20 machines to reduce Fitzwilliam's ongoing risk in his own secret investment;

       (iv)   NASI had paid Gensar Saleh $60,000 for machines he did not own at the same time Fitzwilliam was writing his comfort letter to the potential NASI investors;

       (v)    NASI's real ATM rental income of approximately $150,000 per month represented only a small fraction of the "rent" being paid out to investors every month, the majority of which was actually paid with money from new investors;

(vi)    NASI regularly wrote hundreds of checks out of the Locations Account and the Investors Account with insufficient funds to cover those checks and Fitzwilliam had to direct CNB to loan the money to NASI as a bridge to cover its illiquidity and incompetence to balance its own check books;

(vii)    In early 2009, Fitzwilliam had lied to investors by stating that NASI had received millions each month in rent from ATM service providers.

144.    Fitzwilliam was a secret investor in NASI, in violation of banking laws and CNB's personnel policies, which motivated him to write the letter to keep NASI attracting new investors so he did not lose his own investment, because he knew his ATM's did not exist or have locations to generate the transaction fees he had been receiving.

145.    By Fitzwilliam providing these services, CNB provided the ATM Ponzi Scheme critical legitimacy to continue and conceal the ATM Ponzi Scheme and to ensure that it received new victim investors to keep it afloat and also continue providing Fitzwilliam a 20% return and the ability to cash out.

146.    In early 2009 Jon Currie was worried about the 120 ATM's head purchased from NASI. Currie met with Gillis to discuss his existing investment in NASI.  Gillis assured him that NASI was in solid shape and suggested that Currie meet with Fitzwilliam, NASI's account manager at CNB, to discuss his concerns.  Exhibit 2, Currie Decl. ¶¶ 1-7.

147.    In February or March 2009, Currie telephoned Fitzwilliam at CNB to discuss NASI.  Fitzwilliam assured Currie that NASI was instead a legitimate business and long time, valued client of the bank with $4 million in its accounts at CNB at the time of the call.  During the phone call, Currie described to Fitzwilliam his understanding that under the business model of NASI, by 2009 NASI was managing 10,000 ATM's and owned two-thirds of those machines; investors had purchased one-third of the ATM's from NASI and then NASI leased them back to operate and pay rent.  Based on the information that Currie had received from NASI (the same as Fitzwilliam had received) Currie told Fitzwilliam that:

     *"NASI should be receiving about $3 million per month in rent for*

> *all machines, that NASI should be accumulating millions of dollars*
> *in profits each year, and that the rent income should be coming from*
> *companies like Cardtronics or similar companies and not individuals."*

Exhibit 2, Currie Decl. ¶¶ 8-11.  .

148.    Currie then asked Fitzwilliam if NASI's internal bank records at CNB were consistent with Currie's description of the monthly rental income received by NASI for all 10,000 of the machines that NASI it owned or had sold to, and then leased back from, investors. Currie made it clear that the rent money coming into CNB for NASI had to be from ATM service providers, like Cardtronics and not individual investors. Fitzwilliam responded in the affirmative that Currie's description of NASI's business model was accurate. Currie relied upon Fitzwilliam's representation and decided to maintain his investment in NASI.  Exhibit 2, Currie Decl. ¶¶ 11-13.

149.    Fitzwilliam knew that his assurances to Currie were not truthful, and the NASI Account records at CNB show that these assurances were not true.  In the year 2008 preceding the call with Currie, NASI deposited over $29 million in individual investor checks (including Fitzwilliam's Trance 3) into NASI CNB General Account and only $1.7 million in checks from service providers.

150.    Rather than tell Currie that he did not know the answers to his questions and he needed to investigate, Fitzwilliam's assurance to investors like Currie and his vouching for NASI provided substantial assistance to the ATM Ponzi Operators, which helped perpetuate and cover-up the ATM Ponzi Scheme.

**4.      Fitzwilliam Aids NASI to Avoid CNB Compliance.**

151.    Fitzwilliam also assisted the scheme by helping NASI avoid detection by CNB and its compliance department.

152.    Because CNB regularly loaned money to NASI to cover hundreds upon hundreds of checks written by NASI with insufficient funds, the compliance department at CNB had a heightened interest in knowing that NASI was capable of repaying its debt.

153.    CNB's "compliance" practices included assuring that CNB's practices complied with its own ordinary business banking practices as generally included in its internal policies and procedures as described in a type of Standard Procedures Manual.

154.    CNB also held itself out to the public as having competitive advantage over other similar California banks because it knew about his depositors' businesses and needs better than any other bank, CNB promoted this as unique to CNB.

155.    No later than April 29, 2010, CNB knew that privately owned ATM businesses were high-risk for fraud and knew the questions to ask to identify fraudulent ATM businesses.

156.    According to Wishner and Gillis, CNB started to investigate NASI in or about 2009, and annually thereafter.  Starting in 2009, CNB requested that Fitzwilliam obtain information from Gillis and Wishner about the business conducted by NASI, including the source of the funds being deposited at CNB.  Wishner told Fitzwilliam that he would not disclose this information to others at CNB, and that if Fitzwilliam insisted on doing so, NASI would move NASI's business to another bank, if this information had to be disclosed to others at CNB, Fitzwilliam assured Gillis that he would "push the matter past compliance."

157.    In 2009, Fitzwilliam's motives to "push the matter past compliance" included his desire (i) to continue to monitor the NASI accounts he supervised to watch for the safety of his own investments in NASI; (ii) to continue to provide liquidity to NASI by covering checks written with insufficient funds to keep the Scheme from collapsing; (iii) to prevent disclosure to the bank that he had secretly invested in NASI; and (iv) to keep NASI alive long enough to extract his principal while continuing to earn his 20% return.

158.    Since Fitzwilliam was not innocent and knew that NASI was a fraud, which he and CNB had been assisting, he did not comply with CNB's request for information and allow NASI to move its operations to another bank.  Instead he retained NASI as a CNB client of CNB and continued to assist the ATM Ponzi Scheme.

159.    On or about May 19, 2010 the CNB "back office" requested that Fitzwilliam obtain certain information from NASI which would have disclosed the source of its income.

Fitzwilliam passed the questions to Gillis, who discussed the issue with Wishner. In accord with their agreement with Fitzwilliam, NASI refused to answer the questions posed by CNB, and Fitzwilliam pushed the ATM Ponzi Operators lies "past compliance" at CNB.  Exhibit ML-18.

160.    The information sought by CNB included:

- Who owned the NASI ATM's?

- What was the number of NASI ATM's?

- Where were the NASI ATM's located?

- Who serviced NASI's ATM's? and

- What was NASI's projected revenue for 2010?

161.    Based the request by compliance, it appears that CNB's "back office" mistakenly believed that NASI owned the thousands of ATM's from which it derived the income it deposited at the bank in the General Account and not just the 250 ATM's identified as payees in the Locations Account.  Thus, CNB's compliance department was ignorant of the Scheme and Fitzwilliam's own knowledge thereof.

162.    On May 19, 2010, Fitzwilliam transmitted to Gillis CNB's questions. Gillis emailed Fitzwilliam a false, cryptic and incomplete response to CNB's questions, Fitzwilliam told Gillis he would forward NASI's response to CNB "to see if this will satisfy their [CNB's] file," thus fulfilling his promise to Wishner and Gillis to push things past compliance.

163.    By passing on Gillis' false response to CNB, Fitzwilliam approved, endorsed and ratified Gillis' false representations to CNB that NASI purchased ATM's from manufacturers, when Fitzwilliam knew that NASI sold ATM's to investors, who are then paid rent out of the Investors Account each month including, at that exact moment in time, rent for 20 machines that Fitzwilliam "leased" to NASI through Bribet Services.

164.    When CNB compliance personnel requested documentation about the identity of the owners of NASI's ATM's, Fitzwilliam could have easily obtained from NASI and produced to CNB the Investor Summary Reports for the other investors and could have excluded the reports for Bribet Services. These reports would have answered CNB's question about who

owned NASI machines as well as the number of ATM's (10,000 plus) and their purported locations.

165.    Fitzwilliam did not produce the Investor Summary Reports for all the other NASI investors (excluding his own reports).

166.    Fitzwilliam made no attempt to obtain the answers to the same questions posed by CNB's compliance department, because he knew the answers and he knew that those answers showed the existence of the Scheme.

167.    Fitzwilliam's monthly transactions for each machine in Tranche 3 showed that there should have been ATM's at 10 different hotels operated by Hilton, Doubletree, and Embassy Suites in 10 different cities, all east of Woodland Hills.  At that time, the 10 machines owned by Bribet Services were poor performers and did not provide enough return to satisfy the 20% guarantee, which caused Fitzwilliam to perform his own accountings and demand the minimum guaranteed by NASI.

168.    Starting in the spring of 2010, however, when Fitzwilliam was "pushing NASI past compliance," each hotel in each city which contained a Tranche 3 Bribet Services ATM machine, experienced a large, sudden alleged increase in pedestrian foot traffic causing the average transactions for all 10 machines to increase from 365 in March 2010 to 420 in March of 2011, 439 in March 2012, 432 in March 2013 and 417 in March of 2014.   In reality, this was the result of NASI's preferential treatment for Fitzwilliam in exchange for his aiding and abetting and protecting the Scheme.

### 5.    CNB Attempts to Find Alternate Funding for NASI.

169.    In the summer of 2013, when NASI was short of funds, Fitzwilliam further attempted to assist NASI obtain a listing on a stock exchange in London.

170.    On July 19, 2013, Fitzwilliam wrote a letter on CNB letterhead to the President of GXG Markets promoting NASI as a valued client of CNB, misrepresenting the amount of funds NASI had on deposit with the bank, and falsely claiming "to date we have never experienced any

issues or problems with any of their accounts and enjoy having their relationship here at City National Bank."

### 6. CNB Conceals and Ratifies the ATM Ponzi Scheme.

171.    On September 18, 2014, the SEC filed an enforcement action against NASI, Gillis, Wishner and other entities for their ATM Ponzi Scheme activities.

172.    As a result of the SEC action, subpoenas, and victim complaints filed directly against CNB, CNB's officers and departments had further notice of the fraud and scheme,   and CNB adopted and ratified the conduct of Fitzwilliam and its other employees by failing to report the activities of which it was aware.

### 7. Fitzwilliam Furthers the Fraud By Assisting to Hide Its Proceeds.

173.     In or about June and July of 2008, Wishner and Gillis invested $5,000,000 of NASI's stolen money with EK Trading, Inc. to purportedly buy 7 kilos of a rare element to resell at $87 million.  NASI transferred the $5 million from NASI's CNB account in a series of large wire transfers, which, on information and belief, were observed and approved by Fitzwilliam as the account manager. The wire transfers to EK Trading, Inc. occurred at the exact same time Fitzwilliam was investing $120,000 of his own money with NASI to buy Tranche 3 ATM's with the 20% guaranteed return on his investment.

174.    NASI's investment with EK Trading, Inc. was a device to hide money in Panama. The $5 million was gone immediately, and it remains unaccounted for today.

175.    After this transfer, Gillis and Wishner invested over $5 million of NASI stolen funds in Fuel Doctor, which was selling a device plugged into cigarette lighters to save on gas consumption.  As demonstrated below, Fitzwilliam was completely knowledgeable about the facts surrounding NASI's investment in Fuel Doctor.

176.    In early 2009, a non-NASI employee Mark Soffa ("Soffa") became aware of a consumer product later named "FD-47," which claimed to reduce fuel consumption and increase power output in a vehicle when plugged into the cigarette lighter socket.   Soffa obtained

distribution rights to the device in North America and solicited Wishner and Gillis to invest, which they agreed to do. Exhibit 3, Soffa Decl. ¶¶ 1-4.

177.    In May of 2009, Gillis and Wishner formed Fuel Doctor, LLC as the entity to run the business of manufacturing and selling the FD-47 to the public.  Wishner and Gillis agreed to contribute the money, and Soffa agreed to contribute the product.  Exhibit 3, Soffa Decl. ¶¶ 5, 6. Fitzwilliam aided and abetted Gillis and Wishner by helping them use proceeds of the ATM Ponzi Scheme in connection with Fuel Doctor.

178.    In or about May of 2009, Soffa, Gillis and Wishner opened a bank account at CNB for Fuel Doctor to be managed by Fitzwilliam, and from 2009 to 2014, transferred more than $5 million of the ATM Ponzi Scheme proceeds from NASI's accounts to Fuel Doctor. Exhibit 3, Soffa Decl. ¶¶ 15, 16. 19 The money transferred was not available to pay Plaintiffs their 20% return or his principal.  Fitzwilliam's assistance to NASI and Fuel Doctor is described in Exhibit 3, Soffa Decl. ¶¶ 16-37.

179.    At the inception of the Fuel Doctor account at CNB, Wishner told Fitzwilliam that NASI would be assisting Fuel Doctor with funding, and Fitzwilliam should monitor the Fuel Doctor account and alert NASI if money were needed from NASI to cover checks written from the Fuel Doctor account at CNB when there were insufficient funds.   Wishner instructed Fitzwilliam that NASI would cover Fuel Doctor's bad checks, and Fitzwilliam needed to alert Wishner when funds were needed to be transferred between accounts. Fitzwilliam agreed to play the same role of balancing Fuel Doctor's checking account as he was already doing for NASI's with respect to the Locations Account and Investors Account.  On various occasions, Fitzwilliam further aided and abetting NASI by alerting NASI to ongoing deficiencies in Fuel Doctor's account at CNB, and did so in a manner inconsistent with standard banking practices and consistent with his personal relationship with the ATM Ponzi Operators.

180.    Fitzwilliam also provided further assistance by writing a letter on behalf of Fuel Doctor to Best Buy in late 2009 to explain that NASI owned 50% of Fuel Doctor and was providing NASI's financial strength so that Best Buy could rely upon that when considering Fuel

Doctor's satisfaction of its vendor requirements. Fitzwilliam also facilitated Fuel Doctor's hard money loan of just $44,998.75 from Factors Southwest in Phoenix, Arizona.

181.    In or about January of 2011, Wishner and Gillis decided to transform Fuel Doctor into a public corporation to raise capital through the sale of stock to the public, in order to permit them to make a possible financial exit from the ATM Ponzi Scheme. Gillis offered stock options in Fuel Doctor to Fitzwilliam.

182.    In connections with the public offering, Gillis, Wishner and Soffa first established Fuel Doctor Holdings, Inc. as the company that would own the stock (and thus the assets) of Fuel Doctor, LLC.  On September 25, 2011, Fuel Doctor Holdings, Inc. obtained its stock exchange symbol OTCBB: FDOC. However, Fuel Doctor Holdings, Inc. was unable to effectively trade on its stock in the United States.

183.    Undeterred, in January of 2013, Wishner and Gillis retained a consultant to help raise capital in the European market for Fuel Doctor.  On March 4, 2013, the consultant formed Environmental Energy Solutions, Inc. ("EES") which was incorporated in New Brunswick, Canada, as the corporate entity that would go public overseas.  EES then acquired Fuel Doctor, LLC.

184.    As part of that effort, at the request of Gillis and Wishner, on July 19, 2013, Fitzwilliam wrote a letter of support to Alex Benger of GXG Markets in London, which made several misrepresentations, based on what Gillis and Wishner needed Fitzwilliam to say, in contrast to what the CNB account statements in his possession actually disclosed.  For example, Fitzwilliam represented that as of July 19, 2013, NASI maintained average balances in excess of $3,600,000, but NASI's minimum balance in the General Account was $770,825.35 and its average collected balance was $2,163,855 as of June 28, 2013.  Even if one included the $50,000 average balance in the Investors Account and the $10,000 average balance in the Locations Account, $3,600,000 was not accurate.

185.    Fitzwilliam's letter also represented that to "date we have never experienced any issues or problems with any of their accounts and enjoy having their relationship here at City National Bank." As detailed above, this statement was false.

186.    In February 2014, NASI failed to secure the European offering which eliminated the hope that Fuel Doctor's FD-47 would save NASI.   In June of 2014 the SEC started to investigate NASI.

187.    Soon after August 22, 2014, Fitzwilliam meet with Soffa, in order to discuss the closing of the Fuel Doctor accounts at CNB.  Fitzwilliam knew that Soffa knew that Fitzwilliam owned NASI ATM's.   At that time, Soffa and Fitzwilliam discussed the termination of CNB's relationship with NASI, and Fitzwilliam represented to Soffa that he (Fitzwilliam) "just couldn't cover for them anymore."    Exhibit 3, Soffa Decl. ¶ 37.  This acknowledged that he had been covering for NASI and the ATM Ponzi Scheme.

### FIRST CAUSE OF ACTION
### (Aiding and Abetting Fraud)

188.    Plaintiffs incorporate the allegations in all prior paragraphs as if fully set forth herein.

189.    Defendant CNB had actual knowledge of the fraud committed by Gillis and Wishner through NASI and provided substantial assistance to the intentional tort committed by them.

190.    As the direct and proximate result of defendant CNB's aiding and abetting the fraud committed by Gillis and Wishner, the ATM Ponzi Scheme damaged the named and other Plaintiffs in amounts to be proven at trial, which Plaintiffs are entitled to recover from CNB.

191.     The conduct of defendant CNB and of Fitzwilliam and other co-schemers was intentional, willful, malicious, and oppressive, by virtue of which Plaintiffs are entitled to an award of exemplary and punitive damages in an amount to be determined by the jury.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting Conversion)

192.    Plaintiffs incorporate the allegations of all prior paragraphs as if fully set forth herein.

193.    Plaintiffs had the right to possess the ATM's purportedly sold to them by NASI or the money transferred to NASI for the specific purpose of buying the machines.  CNB had actual knowledge that the money transferred to NASI by Plaintiffs was to be used for a specific purpose, and no other purpose.  NASI wrongfully interfered with Plaintiffs' possessory interest in the money designated to buy the machines. CNB, with actual knowledge, provided substantial assistance to NASI's wrongful interference with Plaintiffs' possessory interest in the money designated to buy the machines.

194.    As the direct and proximate result of defendant CNB's aiding and abetting conversion, CNB damaged the Class Representatives and other Plaintiffs in amounts to be proven at trial, which Plaintiffs are entitled to recover from CNB.

## THIRD CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty)

195.    Plaintiffs incorporate the allegations of all prior paragraphs as if fully set forth herein.

196.    Fitzwilliam knew that NASI held itself to be a fiduciary of the Plaintiffs. The money transferred by the Plaintiffs to NASI was to be held and used by NASI solely to buy ATM's for Plaintiffs, and for no other purpose.  CNB knew the money deposited into its NASI account was specifically earmarked to be used to buy ATM's for each Plaintiff and for no other purpose. The form lease agreement between NASI and each Plaintiff created a fiduciary relationship of trust and confidence between the parties arising out of NASI's duty to collect, account and then remit to Plaintiffs' the rent earned by their ATM's.  CNB knew the terms and conditions of the lease agreement, because Fitzwilliam was himself an owner and lessor of NASI ATM's through Bribet Services.

2880639.1

197.     Fitzwilliam and CNB had actual knowledge that NASI was breaching fiduciary duties owed to each Plaintiff by not acquiring the ATM's with the money specifically earmarked to be used to buy machines and by fabricating the rental receipts.   Fitzwilliam and CNB substantially assisted NASI's breaches by paying the Plaintiffs' phantom rent based on fabricated transaction fees with money specifically earmarked to acquire ATM's.

198.     As the direct and proximate result of defendant CNB's aiding and abetting the breaches of fiduciary duties, CNB damaged the Class Representatives and other Plaintiffs in amounts to be proven at trial, which Plaintiffs are entitled to recover from CNB.

### FOURTH CAUSE OF ACTION
### (Negligence)

199.     Plaintiffs incorporate the allegations of all prior paragraphs as if fully set forth herein.

200.     CNB owes a duty of care to all Plaintiffs to act as a reasonably prudent bank under the same or similar circumstances.

201.     After CNB obtained the knowledge, through Fitzwilliam, that NASI was an ATM Ponzi Scheme hurting innocent investors, it had the duty to act like a reasonably prudent bank.

202.     A reasonably prudent bank that obtains actual knowledge through its employees that a customer is using it as the vehicle to perpetrate financial crimes would immediately terminate its banking relationship with that wrongdoing customer. CNB breached its legal duty when it failed to terminate NASI as a depositor as soon as it discovered NASI was a fraud and using the bank to accomplish its scheme.   Instead, CNB unreasonably maintained a banking relationship with NASI which proximately caused the foreseeable harm suffered by Plaintiffs.

203.     As a direct and proximate result of defendant CNB's breach of duty to act as a reasonably prudent bank, CNB damaged the Class Representatives other Plaintiffs in amounts to be proven at trial, which Plaintiffs are entitled to recover from CNB.

**FIFTH CAUSE OF ACTION**
**(Negligent Supervision)**

204.     Plaintiffs incorporate the allegations of all prior paragraphs as if fully set forth herein, but allege this cause of action as an alternative remedy.

205.     To the extent that CNB contends that Fitzwilliam acted outside the course and scope of his employment and instead for his own individual advantage and gain, CNB placed Fitzwilliam in a position of immense power to act as the manager of the branch but failed to sufficiently vet, supervise, and control his actions. Such a delegation of authority and control over the instruments of commerce and such failures to supervise were unreasonable. A breach of duties owed, and a direct and proximate cause of the damage to Plaintiffs in amounts to be proven at trial, which Plaintiffs are entitled to recover from CNB.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for Judgment against the Defendants on each Cause of Action, as follows:

A.     For certification of the Class as defined;

B.     For the appointment of the named Plaintiffs as the Class Representatives and the Class Representatives' counsel as counsel for the Class;

C.     For special and consequential damages to Class Representatives and the Class members measured by the net loss of their stolen funds and other damages;

D.     For exemplary and punitive damages in an amount to be determined at trial;

E.     For treble and exemplary damages, as applicable;

F.     For pre-judgment interest;

G.     For costs of this action, including reasonable attorneys' fees as afforded by applicable law; and

H.     For all other relief the Court deems just and proper.

**JURY DEMAND**

      Plaintiffs demand a jury trial.


Dated: New York, New York         GOLENBOCK EISEMAN ASSOR BELL
       September 29, 2017           &   PESKOE LLP


By: _____
       Michael S. Devorkin
       Alexander K. Parachini
       Brittany Bettman

711 Third Avenue, 17th Floor
New York, New York 10017
(T) (212) 907-7300
(F) (212) 754-0330

*Attorneys for Plaintiffs*

2880639.1