## DECLARATION OF EDWARD WISHNER

I, Edward Wishner, declare as follows:

### Background

1. I am one of two former principals of Nationwide Automated Systems, Inc. ("NASI"), which operated from the late 1990s to the fall of 2014 when it was seized by the SEC and a Receiver was appointed ("Receiver" or "Hoffman").

2. The other NASI principal was Joel Gillis ("Gillis"). Gillis and I owned, controlled and operated NASI from its inception to its demise. Based on my daily and constant involvement with NASI, I observed events and from those observations I make this declaration. I am over 18 years of age and competent.

3. I plead guilty to Federal crimes in relation to NASI's business affairs. Attached as Exhibit ML-1 is a true and correct copy of the indictment. A true and correct copy of my plea of guilty, entered in court to some of the charges contained in the indictment is attached as Exhibit ML-2. I am currently incarcerated at Terminal Island in Long Beach, CA. I am 78 years old. I reside in the infirmary at the prison as I require frequent medical attention for certain health conditions. I am offering this declaration as, due to my health issues, I may not survive in prison long enough to testify in person.

### Start of NASI

4. For decades I worked in the Los Angeles area as a California licensed Certified Public Accountant ("CPA"). Gillis and I became involved with NASI in the late 1990's. We learned of, and took over, the NASI ATM business from a former client of mine, who I represented in my capacity as a CPA.

5. NASI was a real business when Gillis and I first became involved with it. NASI's business model was to sell Automated Teller Machines ("ATMs") to investors and concurrently lease them back from the investors in exchange for a share of the transaction fees paid by ATM end-users, which were roughly $2.50

per transaction. The portion of the ATM fees to be paid to the ATM owners on a monthly basis was referred to as "rent" or "ATM transaction fees." NASI guaranteed to each ATM owner that the annual return on investment in the form of "rent" would be a minimum of 20% of the ATM purchase price, which was either $12,000 or $19,800 per machine and these price points never changed over time.

6. One of my functions at NASI was to act as a custodian of business records. In that capacity, I was familiar with the business operations of NASI and had first-hand knowledge of the records needed for NASI's operation. I directly supervised the process and procedure for the creation and storage of NASI's business records, including those contained in the Master List ("ML") Exhibits addressed herein. I assured that NASI's business records were properly filed and maintained as permanent records at NASI.

7. Based on my years at NASI, I know that the ATM purchase and leaseback agreements used by NASI were template forms which were used with all ATM investors from the inception of NASI to its end. True and correct copies of exemplar ATM purchase and leaseback agreements are attached hereto as Exhibits ML-3 and ML-4. Exhibit ML-3 is the $19,800 contract and Exhibit ML-4 is the $12,000 contract. The NASI sale and leaseback agreements were signed by Gillis on behalf of NASI. Based on my years at NASI with Gillis, I became familiar with his signature which is exemplified on Exhibits ML-3 and ML-4.

8. NASI would pay rent each month to each investor based on ATM transaction calculations set out in a document entitled "Investor Summary" which was mailed each month to each investor with their rent check. NASI retained a copy of each Investor Summary report in NASI's permanent records and business files. The Investor Summary reports were normally prepared on a monthly basis and provided to investors on a monthly basis and were saved in the business records at the time they were created. True and correct copies of examples of NASI "Investor Summary" reports are attached hereto as Exhibit ML-5. The

examples in Exhibit ML-5 are for Bribet Services, which was a fictitious business name used by Brian Fitzwilliam and his wife, Betty Fitzwilliam. NASI created, kept and maintained in the course of its usual business practices the "Investor Summary" statements for each investor in the form exemplified by Exhibit ML-5.

### Investor files

9. In the course of its usual business practices, NASI kept and maintained the purchase and leaseback agreements it entered into with investors in an investor file established for each investor (hereinafter "Investor File"). The Investor Files were maintained in storage cabinets at NASI's office. In each Investor File, we generally included the purchase and lease agreement(s), proof of payment of the ATMs by the investor, copies of correspondence from and to each investor, copies of some monthly "Investor Summary" transaction reports and other pieces of information germane to each investor. A true and accurate copy of a typical Investor File (the example is for Bribet Services) is attached as Exhibit ML-6. It was our custom and practice to maintain in each Investor File the documents relevant to each investor's investment in NASI.

10. When NASI was shut down by the SEC in the fall of 2014 and the Receiver came to NASI's offices, all of NASI's computers, computer records, bank records, physical files and other all other NASI records were turned over to the Receiver, including the "Investor Files" and the "Investor Summary" reports, in the form in which they had existed when NASI was operating, without modification. I confirmed to the Receiver that all such materials and records, including the Investor Files and Investor Summary reports turned over to him were part of the NASI business records created and maintained in the ordinary course of NASI's business practices.

### Brian Fitzwilliam

11. Since the inception of my involvement at NASI until August of 2014, all NASI bank accounts were at City National Bank ("CNB"). I do not recall the

name of the original CNB employee that oversaw the NASI account. However, that original CNB employee was replaced in the mid-2000s by Brian Fitzwilliam of CNB ("Fitzwilliam"). Brian Fitzwilliam represented to me that he was an officer of CNB, a Senior Vice President, as well as the Branch Manager for the Woodland Hills area CNB branch. I perceived, based on my interaction with Fitzwilliam and other employees at the bank, that Fitzwilliam was the head of the branch where we performed our banking. NASI continuously maintained its banking accounts exclusively at the Woodland Hills branch. Fitzwilliam was NASI's relationship officer at CNB and he oversaw all NASI's accounts at CNB. From the date he was assigned until late August of 2014, Brian Fitzwilliam was in charge of the NASI accounts at CNB. Accordingly, I had regular and routine communications with Fitzwilliam related to NASI's accounts, their balances and the activity in each account. Because Brian Fitzwilliam and his wife were investors in NASI through a dba called "Bribet Services", investor returns were paid for the benefit of Fitzwilliam and his wife through Bribet. Other monies were paid to other related entities that NASI was directed to pay by Fitzwilliam. These monies were paid out of two NASI accounts at CNB -- the Investors Account and the General Account. For instance, attached hereto as Exhibit ML-7 is a true and accurate copy of a $240,000 check signed by me to Bribet Services dated October 30, 2009. The check is drawn out of the NASI General Account #4410 at CNB. As a custodian of records, I recognize Exhibit ML-7 as a true and correct copy of the business record of the check written to Bribet Services maintained in the ordinary course of business by NASI.

### NASI's accounts at CNB

12.    The NASI account titles we used at CNB described their purpose and use. For instance the main account was number 4410 and entitled the "General Account." The General Account received the money coming into NASI. This included the ATM purchase deposits and rental income from the approximately

250 ATMs NASI acquired and managed. This income came from ATM service providers, including a company called Cardtronics. As part of our routine NASI business practices, Gillis and I would review the copies of NASI's CNB monthly account statements we received from CNB. True and accurate examples of account statements from the General Account are combined and attached as Exhibit ML-8.1. The examples of NASI General Account statements are for June 2009, 2010, 2011, 2012, 2013 and 2014.

13. Disbursements out of the General Account (#4110) included, among others, transfers to the "Investors Account" (#4399) and the "Locations Account" (#4402).

14. The "Investors Account" was used to disburse monthly "rent" payments to the many investors, including Fitzwilliam/Bribet as discussed herein. True and correct copies of examples of the CNB statements for the Investors Account, are combined and attached hereto as Exhibit ML-8.2. The examples are for June 2009, 2010, 2011, 2012, 2013 and 2014. The "Locations Account" was used by NASI to disburse monthly payments to the roughly 250 businesses that hosted the ATMs owned by NASI. Each of these businesses were paid, in general, a monthly fee to provide the location for the ATMs owned and operated by NASI. NASI was careful to be sure these locations were paid in order to maintain the locations for those existing machines. Attached as Exhibit ML-8.3 are true and accurate copies of monthly account statements for the "Locations Account." The examples are for June 2009, 2010, 2011, 2012, 2013 and 2014. Based on my years at NASI, and as a custodian of records, I recognize the statements in Exhibits ML-8.1, 8.2 and 8.3 as bank statements that were received by NASI for the months referenced. NASI received similar statements from CNB on a monthly basis for the period identified in each statement. Upon receipt of these statements, they would be filed in the business files of NASI and maintained as permanent business records. From time to time, I would have occasion to

1 discuss certain statements with Fitzwilliam. Each statement was reviewed upon
2 receipt by NASI and generally reconciled to NASI's internal records by me.

3     15. Fitzwilliam was the employee at CNB that I primarily dealt with when managing the General Account (#4110), the Investors Account (#4399), and the Locations Account (#4402). Funds coming from investors into the General Account could be readily identified by the amount of the individual deposits because they were multiples of either $12,000, or $19,800. This allowed for a quick review to determine how many machines had been purchased in that accounting period.

### NSF Problems at NASI

16. Attached hereto as Exhibit ML-9 are true and accurate copies of "Overdraft Advice" notices received by NASI from CNB and put into reverse chronological order from August 2014 back to July 2006. Based on my years of heavy involvement with CNB and as a custodian of records, I recognize these Overdraft Advices as documents that were provided to NASI by CNB and received by NASI on a regular basis. Upon receipt of these Overdraft Advices, they would be filed in the business files of NASI and maintained as permanent business records. I would routinely have discussions with Fitzwilliam upon receipt of these Overdraft Advices. On many occasions, I was regularly asked by Fitzwilliam to explain the reasons behind the overdrafts and the source of funds from which overdrafts would be cured.

17. Included with Exhibit ML-9 are several overdraft notices from Oasis Studio Rental, LLC, which was a related entity of NASI that I was a signatory on.

18. At a point in time soon after Fitzwilliam invested in NASI he asked me if NASI had money in accounts at any bank other than CNB. He asked if NASI had additional funds beyond that which he managed at CNB. I told Fitzwilliam that NASI had no other bank accounts or other money beyond that on deposit at CNB.

19. In response to the overdraft notices identified above in Exhibit ML-9, Fitzwilliam covered the overdraft amounts for NASI based on promises by Gillis and myself to deposit additional funds into the account containing the deficit. NASI cured all such deficits by either depositing new investor funds, or by transferring funds between the CNB accounts we controlled. At no time did NASI cure such a deficit by transferring funds from another bank besides CNB. In August of 2014, a district manager of CNB was at the Woodland Hills branch when NASI had a liquidity issue and NASI needed to deposit funds because NASI did not have sufficient funds to cover the overdraft. The district manager informed me that she refused to honor checks written by NASI with inadequate funds on deposit to cover certain checks. This comment prompted immediate concern at NASI because there was no way to cover the overdrafts. This refusal to cover the overdrafts occurred when Fitzwilliam was away from CNB for an extended period on what I believed was a vacation. In his absence, these overdrafts were not approved for coverage by the substitute CNB officer. As a consequence of her refusal, NASI bounced investor checks and locations checks as set out in Exhibit ML-9

20. Attached as Exhibit ML-10 are true and accurate copies of several email communications between NASI and Brian Fitzwilliam at CNB. Based on my years at NASI and as a custodian of records, I am familiar with the fact that the emails created by NASI were created on a computer owned or used by NASI and that the emails were created at or about the time indicated in the email itself. Upon creation, copies of the emails were saved on the computer and if the email was sent, a record of the time and date of sending was recorded on the email and saved in the computer from which it was sent. The saved computer files were maintained as a permanent business files and records of NASI. Upon receipt of a response, the responsive email was dated with the date and time of receipt and the entire chain

1 would then be retained in the computer as a permanent record in NASI's business
2 records.

### Fitzwilliam Owns 40 NASI ATMs

21. Fitzwilliam purchased four rounds of ATMs through the use of a fictitious business name, "Bribet Services". I understood "Bribet" to be a combination of Fitzwilliam's first name (Brian) and his wife's first name (Betty). Each of the four rounds consisted of 10 machines at $12,000 per machine for a total purchase price of $480,000. Fitzwilliam made the first of the four investments in November 2006. True and correct copies of Bribet's investment documents and certain payments received by NASI, which were kept and maintained by NASI in the course of its usual business practices are contained in Exhibit ML-6. Exhibit ML-6 is the Bribet "Investor File." I recognize the Bribet Sale and Lease Back Agreements ("Agreements") contained in ML-6 as those used by NASI routinely as the investment vehicle with investors. These documents were executed at or near the time they are dated and, upon creation, they were maintained in the permanent business records of NASI. Based on these Agreements, NASI made distributions to Bribet Services from time to time. At no time did Fitzwilliam or Bribet Services ever express a concern that the Agreements were not properly executed nor was there ever a refusal to accept a distribution made after the Agreements were received by NASI.

22. Included in Exhibit ML-6 is correspondence NASI received expressing Fitzwilliam's concerns that there were deficiencies in the rent payments NASI made under the Agreements which were claimed as past due and owing under the 20% guaranteed return on investment. Also included in Exhibit ML-6 is an October 26, 2009 request that Fitzwilliam/Bribet desired NASI to buy back 20 ATM's for $240,000 which NASI did do pursuant to the request. As previously mentioned, attached hereto as Exhibit ML-7 is a true and accurate copy of NASI's check to Bribet for $240,000 to buy back 20 machines in October 2009. I

1  recognize the check as a check written on the NASI account and prepared at or
2  about the date reflected on the check. I signed Exhibit ML-7.
3        23.    As set forth in Exhibit ML-6, Fitzwilliam, through Bribet, paid for
4  some ATMs with cashier's checks. Cashier's checks were not required by NASI
5  to buy ATMs. Personal checks were the approved method. Additionally, attached
6  hereto as Exhibit ML-11 is a check that NASI received from Fitzwilliam to pay for
7  one of the four Bribet ATM purchases which is dated June 30, 2009. The check is
8  not from Fitzwilliam or his wife, but from Gensar Saleh, as Trustee of the S&J
9  Agreement of Trust in the amount of $120,000. Fitzwilliam told me that this check
10 was to pay for Fitzwilliam's 10 new machines which were to be assigned to the
11 Bribet account at NASI. Fitzwilliam told me that he wanted the rent for these
12 machines to be paid to Bribet and not Gensar Saleh. I agreed to do this for Brian
13 Fitzwilliam. Attached as Exhibit ML-12 is a true and accurate copy of the deposit
14 slip for the $120,000 paid by Gensar Saleh that I deposited with other investors'
15 deposits at CNB. I recognize the deposit slip as a business record of NASI. The
16 deposit slip was prepared at or about the date reflected on the slip and the deposit
17 occurred at or about the time reflected on the deposit slip. The deposit is reflected
18 in the monthly Bank statement that was received for this period of time and the
19 deposit slip was kept in the permanent files of NASI.
20       24.    Attached as Exhibit ML-13 are true and accurate copies of two NASI
21 checks drawn out of the General Account #4410 that I signed when Fitzwilliam
22 sold back 5 machines to NASI in March of 2012 and 5 more machines in August
23 of 2014. The first check for $60,000 was made payable to S & J Agreement of
24 Trust and the second $60,000 check made payable to Gensar Saleh. I signed the
25 checks and wrote them to the identified payees based on the instructions I received
26 from Fitzwilliam. I recognize these checks as checks drawn on or about the date
27 reflected on the checks and I recognize the signature as mine. Once issued, copies
28 of the checks were maintained in the permanent files of NASI.

DECLARATION OF EDWARD WISHNER

25. Fitzwilliam received "rent" on the ATMs he purchased through Bribet. Attached hereto as Exhibit ML-14 are various copies of the NASI rent checks paid to Fitzwilliam's Bribet Services from the Investors Account #4399. These copies were kept in the permanent business files of NASI and were issued at or about the date reflected on the copies of the checks.

26. Attached hereto as Exhibit ML-15 is a summary of investment payments to and from NASI for Bribet and "rent" payments made by NASI on the Bribet account. I am informed Exhibit ML-15 was created by the Receiver. I have reviewed the summary and determined it to be substantially accurate based upon my memory of Fitzwilliam's investments in NASI ATMs.

### Fitzwilliam as a Referral Source for NASI

27. After Fitzwilliam, through his Bribet Services, became an investor in NASI ATMs, I asked him to field calls at CNB from investors and potential investors. Fitzwilliam agreed to my request, said he would do so and he later informed me that he did, in fact, receive and respond to calls from investors that I or Gillis directed to call him at CNB. Fitzwilliam also agreed to and did write a letter on CNB letterhead in this regard dated February 14, 2012, as set out in Exhibit ML-16. I told Fitzwilliam that NASI would use ML-16 to satisfy diligence efforts of potential investors and to convince them to invest in and retain NSAI ATMs. Fitzwilliam supplied the requested letter to me and I provided it to potential investors, as well as existing investors who were contemplating selling their ATMs. At NASI's request, Fitzwilliam wrote another letter dated July 19, 2013, to Alex Benger at GXG Markets, to help Fuel Doctor obtain a listing on a foreign stock exchange. Fuel Doctor was a related entity to NASI. A true and accurate copy of the GXG letter is attached as Exhibit ML-17. I discussed the ML-17 letter with Fitzwilliam after it was sent. At no time did Fitzwilliam deny that he had written the letter.

### Fitzwilliam assists NASI with Questions from CNB

28. From time to time since about 2009 or 2010, Fitzwilliam would come to Gillis and me with questions about NASI's business. Fitzwilliam told me that these annual requests for information were part of CNB's routine business practices and annual review of accounts. One such year's questions from CNB to us, and our answers back to CNB, are set forth in Exhibit ML-18. Exhibit ML-18 contains true and accurate copies of emails received by NASI from Fitzwilliam at CNB, in or about May 2010, and our responses. While the emails in Exhibit ML-18 were exchanged by Gillis at NASI, as opposed to myself, Gillis shared the Exhibit ML-18 emails NASI received with me and we discussed the responses NASI issued thereto which are set forth in Exhibit ML-18. In response to ML-18 and the other CNB requests for information concerning NASI's business, I informed Fitzwilliam that we would not respond further to CNB's requests for information about, among other things, the ownership of ATMs, or the source of NASI's money deposited at CNB. I informed Fitzwilliam that, if CNB persisted with its questions, NASI would take its accounts to another bank. Whenever these conversations took place, Fitzwilliam would appear very nervous. He told me he "would get these disclosure issues past compliance."

### Fuel Doctor

29. Gillis and I were involved with another company called Fuel Doctor which had certain rights to an invention that reduced fuel consumption in older cars. Gillis and I intended to make Fuel Doctor a publicly traded company. In support of that effort, I directed the transfer of over $5 million in NASI funds to Fuel Doctor to support its development and sales of the fuel saving device. Fuel Doctor's bank accounts were maintained at CNB and they were overseen and managed by Fitzwilliam.

30. True and correct copies of checks signed by me and sent from NASI to Fuel Doctor which were honored by CNB are attached hereto as Exhibit ML-19.

31. At the inception of our relationship with Fuel Doctor, I told Fitzwilliam we would be assisting the company with funding from NASI. I told Brian Fitzwilliam to monitor the Fuel Doctor account and to alert us if money was needed to cover checks written with insufficient funds in the Fuel Doctor account. I told him that NASI would cover those checks. Attached as Exhibit ML-20 are true and accurate copies of some of the emails I received from Fitzwilliam alerting us to deficiencies in Fuel Doctor's account at CNB.

32. By November of 2012, Gillis and I wanted to be removed as signers on the Fuel Doctor account at CNB. I informed Fitzwilliam of this and he wrote and sent the email dated November 14, 2012, which is attached as Exhibit ML-21.

33. Fitzwilliam assisted us in the planned initial public offering of Fuel Doctor by writing the GXG letter dated July 19, 2013, which is attached as Exhibit ML-17.

### End of NASI

34. The SEC subpoenaed NASI for documents June 17, 2014, as reflected in Exhibit ML-22. Attached hereto as Exhibit ML-23 are true and correct copies of the July and August 2014 CNB statements for the NASI General Account. We continued to conduct business as usual with CNB until it terminated our relationship in late August 2014, as reflected in Exhibit ML-24. Fitzwilliam sold back to NASI 5 ATMs on or about August 6, 2014.

35. Attached as Exhibit ML-25 are letters we sent to NASI investors.

36. Attached hereto as Exhibit ML-26 is a true and accurate copy of a Wall Street Journal newspaper article on an ATM Ponzi scheme that was taking place back east in 2009. I saw the article at or about the time it was printed and its

contents was a topic of discussion between me and Gillis. The article came out just prior to Fitzwilliam selling back his 20 machines in late October 2009.

### The Close Relationship Between NASI & CNB, Which Was Rooted In Daily Communications with Fitzwilliam, Enabled NASI to Continue Operations for More than 15 Years

37. As discussed above, my CPA office was near the Woodland Hills branch of CNB. For years, I met face to face with Fitzwilliam in his office at CNB at least 2-3 times per week on average. Sometimes more frequently. Fitzwilliam and I would discuss NASI account activities on a regular basis. The discussions were not limited to issues I raised. Fitzwilliam would raise new topics as well, just as he did when he first asked to invest in NASI. On occasion, when Fitzwilliam raised a topic, he would transmit to NASI hard copies of bank statements and related records to discuss them with Gillis and myself. Upon receipt of these statements and records, the materials would be filed in the business files of NASI and maintained as permanent business records. Attached hereto as Exhibit ML-27 (which has three parts, 27.1, 27.2 and 27.3) are true and correct copies of certain NASI CNB account statements which Fitzwilliam sent to NASI: (i) ML-27.1 is an April 2012 NASI account statement for the Locations Account (xxx4402) which NASI received by fax from CNB June 7, 2012; (ii) ML-27.2 is a June 2012 account statement for the Investors Account (xxx4399) which NASI received by fax from CNB June 29, 2012; and (iii) ML-27.3 is a June 2012 NASI account statement for the General Account (xxx4410) which NASI received by fax from CNB June 29, 2012. Based on my years at NASI and as a custodian of records, I recognize these statements as NASI business records (and in fact duplicate copies of CNB statements NASI already had, with the addition of the handwritten notes which were present on ML-27 when NASI received ML-27) which were received, kept and maintained in NASI's files in the course of the usual business practices at NASI. As noted, in each of the 3 faxes contained in ML-27, the first page of the

fax is not a cover sheet. Rather, the first page of each fax is a page from a bank statement. Due to the frequency of communication between NASI and CNB, it was not unusual for Fitzwilliam to send NASI faxes without a cover sheet. Relatedly, it was not unusual for Fitzwilliam to send NASI emails which did not address Gillis, or myself in any formal voice (i.e. page 969 of Exhibit ML-20, starting with "Hi guys...").

38. In the many meetings I had over the years with Fitzwilliam at CNB, I frequently observed Fitzwilliam place his mark, or initials on documents, such as deposit slips. Based on the many times I personally saw Fitzwilliam make his mark on documents, I became familiar with Fitzwilliam's mark. Attached hereto as ML-28 are true and correct copies of several documents bearing signatures or initials that I believe to be Fitzwilliam's mark. Upon receipt of these documents, they would be filed in the business files of NASI and maintained as permanent business records. As a custodian of records, I recognize the documents in ML-28 as business records of NASI which were received, kept and maintained in NASI's files in the course of the usual business practices at NASI. The deposit slips and other documents in ML-28 were prepared at or about the date reflected on the documents. The deposits are reflected in the monthly Bank statement that was received for this period of time and the deposit slip was kept in the permanent files of NASI.

39. The relationship with Fitzwilliam was important to NASI in many ways. Fitzwilliam was a critical part of NASI's ability to function, especially when NASI experienced liquidity issues, as it did from time to time. When NASI was unable to cover checks, Fitzwilliam was willing to do so. Had CNB not covered checks in tough times, NASI would have collapsed before 2014. That reality is apparent due to the fact that NASI's collapse in August 2014 arose in Fitzwilliam's absence from CNB when NASI needed checks covered and the replacement manager refused to cover the checks.

40. Attached hereto as Exhibit ML-29 are true and correct copies of additional NASI account statements received from CNB and stored in NASI's files in the course of its usual business activities. Certain pages of ML-29 contain handwritten notes which I made.

I declare under penalty of perjury under the laws of the State of California that the forgoing is true and correct and that this Declaration was executed on June 19, 2017 at the Federal Penitentiary at Terminal Island, Long Beach, in the County of Los Angeles, California.

*Edward Wishner*
Edward Wishner