# Declaration of Mark Soffa

I, Mark Soffa, declare that the statements below are based on my own personal knowledge unless stated otherwise and if I was called onto a witness stand under oath I could and would state as follows:

1.  I am over 18 years old and mentally competent. I reside in Calabasas, California. I execute this declaration in Calabasas. I did perform services for Nationwide Automated Systems, Inc. as explained below. From 2009 to 2014 I worked primarily on matters related to Fuel Doctor, LLC.

2.  Between 1993 and 2003, I worked as an Executive VP for Sweda Company, LLC. From 2004 to 2007, I was the President and CEO of Scorpion Trading & Promotions, LLC. In 2008, I was hired as a consultant to Branders.com, whose sales offices were located then in Pasig City, Manila-Philippines. I traveled to and from Manila every 2 weeks to hire, train and motivate a sales force of approximately 600 people.

3.  From May of 2009 until August of 2014 I worked primarily developing and marketing a consumer product for Fuel Doctor, LLC ("FD"). I also did work for Nationwide Automated Systems, Inc. ("NASI") which was a related entity. I had no access to the bank records of NASI during the time I performed services for that entity. I had no idea NASI was being operated as a fraud by Edward Wishner and Joel Gillis until its collapse in the fall of 2014.

4.  My relationship with NASI started in early 2009. In 2009 I became aware of a product later named "FD-47." The FD-47 product reduced fuel consumption and increased power output in a vehicle when plugged into the cigarette lighter socket. After examining formal test results showing it reduced fuel consumption on various vehicles, I obtained distribution rights to the device in North America.

5.  In early 2009, Edward Wishner ("Wishner"), my accountant at the time, set up an investment meeting with me and his partner Joel Gillis ("Gillis"). It was represented to me that Wishner and Gillis were the owners and operators of NASI. Based on my personal

1

observations it appeared to me that they were the owners of NASI. NASI purported to own, sell, lease, and service Automated Teller Machines ("ATMs"). After examining the test results for the FD-47, Wishner and Gillis agreed to fund the operations of FD through personal investments and money from their business at NASI.

6. In May of 2009, Gillis and Wishner and myself formed Fuel Doctor, LLC as the entity which would run the business. Wishner and Gillis contributed money and I contributed the product, the North American distribution rights to the product as well as the benefit of all the test results which I had paid for personally. Gillis, Wishner and I named the device the "FD-47."

7. Starting in May of 2009 I worked part time for FD as a Consultant, FD was having a hard time getting off it's feet and by August of 2009 Wishner and Gillis asked me to take over management as the CEO of FD. I agreed to do this work for $25,000 per month salary, plus a car and expenses.

8. I marketed and sold the FD-47 device to Best Buy, Advanced Auto Parts, Sportsman's Guide, The Sharper Image, Canadian Tire Corporation and Army/Air Force stores, among a host of others. All said companies began selling the FD-47 and it produced income.

9. In or about January of 2011, Wishner and Gillis decided to transform FD into a public corporation to raise capital through the sale of stock to the public. I fought this idea. Nevertheless, despite my protestations to the contrary, Wishner and Gillis stuck to their position and used their financial clout to exert pressure on me. I ultimately gave in and agreed to work with them to make FD a publicly traded company.

10. In connection with the public offering, Gillis, Wishner and myself established Fuel Doctor Holdings, Inc. as the company that would own the stock (and thus the assets) of Fuel Doctor, LLC. Wishner, through his friend Mike McIntyre, recommended Touchstone Advisors, an advisory company. Touchstone Advisors orchestrated a reverse merger with a shell company named Silver Hill Management. The first public money came in pursuant to a private placement memorandum ("PPM") for $1,000,000.

11. On or about September 25, 2011, Fuel Doctor Holdings, Inc. obtained its stock exchange symbol OTCBB: FDOC. Fuel Doctor Holdings, Inc. started selling stock in May of 2012, but the stock had limited success in being sold to the public in the United States due to the delay by the Depository Trust & Clearing Corporation ("DTCC").

12. In January of 2013, Wishner and Gillis retained a consultant to help raise capital in the European market for FD. On or about March 4, 2013, Environmental Energy Solutions, Inc. ("EES") was formed which is incorporated in New Brunswick, Canada, as the corporate entity that would go public. EES then acquired the rights of Fuel Doctor, LLC. From March to September 2013, I continued to assist in the efforts to gain EES public status on the Frankfurt and London stock exchanges.

13. In February 2014, I learned we had not secured the European offering on the GXG (the London/Frankfurt Exchange) for EES and FD. From March 2014 to July 2014, I was assured by our consultant that he could secure EES's place on the NSX (the Australian Exchange) by obtaining approvals from the Australia securities agency.

14. During the time I worked for FD, between 2009 and 2014, I wore many hats besides CEO. I acted as:

    a. Sales Manger

    b. Marketing Manager

    c. Production and Import Manager

    d. International Sales and Marketing Manager

    e. Trade Show Manager

    f. Booth Design and Packaging Manager

    g. Public offering SEC documents management.

15. In May of 2009 Gillis, Wishner and I opened up an account for FD at City National Bank ("CNB"). We were the three signers on the main account and several other accounts. Gillis and Wishner recommended CNB as FD's bank because NASI banked at CNB and they told me they had a close relationship with Brian Fitzwilliam, the branch manager at the

Woodland Hills branch of CNB. Subsequently, I personally observed the close relationship between CNB and NASI as described herein.

16. FD's money to operate came primarily from accounts in the name of NASI at CNB. I had no access to NASI's accounts. Other money deposited into FD's accounts included the private placement funds, revenue from FD sales and personal loans.

17. The person at CNB that I perceived was responsible for managing FD's accounts at CNB was Brian Fitzwilliam ("Fitzwilliam"). Based on my visual observations and review of documents I perceived that Fitzwilliam was also the account manager of NASI's accounts at CNB. Based on my visual observations of Fitzwilliam and the other employees at CNB when dealing with Fitzwilliam, I understood Fitzwilliam to be the most senior employee at the CNB Woodland Hill's branch and his card stated he was a Senior VP of CNB and also the Branch Manager. I dealt with Fitzwilliam on many occasions regarding FD accounts and the deposit of funds into FD's accounts. Often I would make walk-in deposits at the bank, which were mainly handled by Fitzwilliam. If Fitzwilliam was at the bank at the time I made deposits, he would always motion me into his office and take care of any business or personal business we had at CNB and always make sure that my parking was validated. Most of the deposits into FD's accounts were handled by Edward Wishner or his bookkeeper. Ed Wishner was the appointed Chief Financial Officer of FD and he performed in that capacity.

18. Over the years I developed a strong business banking relationship with Fitzwilliam regarding the activity related to FD accounts. I would estimate that I physically saw him on average of 2 to 3 times per week. I also called him and texted him on his cell phone at least 4-5 times a week. Attached as Exhibit ML-30 are copies of texts between me and Fitzwilliam. I saw Fitzwilliam primarily at his CNB branch, but also at the NASI offices and the FD offices. Soon after our relationship began, I frequently called Fitzwilliam at CNB to alert him to FD account issues and activity. Fitzwilliam told me that it was not necessary for me to alert him to such issues and activity. Fitzwilliam informed me, in substance, that he monitored the NASI and FD accounts at CNB on a daily basis, that he was intimately familiar with the activity in and purposes for the NASI and FD accounts, that he understood the NASI and FD

lines of business, and that his knowledge of CNB's important depositors' business needs, coupled with his diligence and personalized banking services for NASI and FD, were and would continue to be an important part of the success and growth of NASI and FD.

19. Attached to my declaration as Exhibit ML-19, are true and accurate copies of checks to FD coming primarily from NASI and signed for the most part by Edward Wishner. Also included are deposit slips used to deposit the checks from NASI to the FD accounts. I have reviewed the documents contained in Exhibit ML-19 and can say that the monetary transfers reflected in the documents did in fact occur and they occurred at CNB. Over $5 million was transferred from NASI to FD in accounts at CNB. I know that based on my review of FD's CNB account records. I did not have access to NASI account records. I have deposited checks issued to FD directly with Fitzwilliam and can identify his initials on deposit slips. I do recognize the initials on the $350,000 deposit that took place on February 2, 2010 as Fitzwilliam's initials. See page 868 of Exhibit ML-19.

20. In May of 2009, at the opening of its banking relationship with CNB, the signers on the FD accounts were Wishner, Gillis and myself.

21. Attached to my declaration as Exhibit ML-20 are true and accurate copies of some email correspondence between, among others, myself and Brian Fitzwilliam at CNB (except pages 972, 975 and 976 which I knew about). The email exchanges are consistent with the close working relationship that existed between NASI, FD and CNB. Generally, if I saw that FD was low on funds, I would tell Wishner, but Wishner would often-times not initiate a transfer from NASI to FD until Fitzwilliam announced there were insufficient funds at FD to cover outstanding checks. Fitzwilliam would generally contact Wishner to inform him of the shortfall and Wishner would contact me to discuss the situation. Wishner would then communicate further with Fitzwilliam to have CNB pay the FD checks and thereafter transfer the needed funds from NASI's account to cover the checks. This was standard operating procedure based on an informal understanding we had with Fitzwilliam at CNB which is reflected in the emails attached as Exhibit ML-20.

22. As noted in the emails between Fitzwilliam and myself, as early as January 2010 there was significant informality in our communications. (See Exhibit ML-20 at page 966). Fitzwilliam would email me without salutation, or if he started with a greeting it was often something like "Hi Guys" as noted on page 969 of Exhibit ML-20. I interpreted the close and informal business relationship that existed and operated between Gillis and Wishner of NASI, on the one hand, and CNB's Fitzwilliam on the other, as an implied representation to me by CNB about the legitimacy of NASI. I knew that Fitzwilliam was the person with oversight authority over NASI's accounts at CNB. I knew that Fitzwilliam dealt with Wishner and Gillis on a frequent basis concerning transfers of funds between NASI and FD. I assumed the motive for Fitzwilliam's hands-on accommodations was to foster good will between NASI and CNB because NASI was a big client of CNB. I assumed further that because Fitzwilliam had access to NASI's banking books and records, and because he was the Senior VP and Branch Manager, that Fitzwilliam could see any impropriety taking place at NASI and he would not assist any improprieties. I later learned from Fitzwilliam himself that assumptions were incorrect (see below).

23. Fitzwilliam assisted FD in numerous ways. For instance attached to my declaration as Exhibit ML-31 is a true an accurate copy of an email I wrote to Cheryl from Best Buy regarding FD financial relationship with NASI. In that email dated December 15, 2009 I explained that FD did not have 3 years of financial statements needed to satisfy vendor requirements at Best Buy. Instead I was able to obtain and send a letter written by Fitzwilliam which explained that the owners of NASI owned 50% of FD and it was NASI that provided the financial strength and monetary commitment for FD to operate which should satisfy Best Buy. I personally reviewed the letter written by Fitzwilliam and I caused it to be sent it to Best Buy as reflected in my email. A true and correct copy of Fitzwilliam's letter to Best Buy is also included in Exhibit ML-31.

24. Attached to my declaration as Exhibit ML-32 are true and accurate copies of an email chain I was copied on between Fitzwilliam and Robyn Barret of Factors Southwest ("FSW") regarding a wire from FSW to FD. FSW is a factoring company that advanced money

6

to FD on invoiced shipments of the FD-47. FSW would then be paid by the retailer who bought the FD-47 products. This is standard practice in retail financing. Fitzwilliam assisted me in obtaining the approval from FSW, the proceeds of which were transferred to FD's account at CNB on or about June 22, 2011 as is reflected in Exhibit ML-32.

25. Attached to my declaration as Exhibit ML-17 is a true and accurate copy of a letter from Fitzwilliam on CNB stationary, dated July 19, 2013. The letter is addressed to Alex Benger of GXG Markets in London, England. Exhibit ML-17 was written by Fitzwilliam based on my request through Todd Sanders, as part of our efforts to get FD listed on a foreign stock exchange as part of the plan of Gillis and Wishner to sell stock to the public. Fitzwilliam was asked to write a letter explaining that NASI was the financial backer of FD which explanation was required in order for FD to be listed on the exchange. GXG required assurances that FD was financially stable which assurances FD could not issue on its own because it was dependent upon NASI's financial backing. Fitzwilliam had already assisted NASI by issuing assurances to potential NASI investors regarding NASI's finances and Fitzwilliam supplied the GXG letter to further assist NASI.

26. Attached to my declaration as Exhibit ML-33 is a true and accurate copy of a letter (unsigned) which is dated April 22, 2014. A version of the letter was signed by Fitzwilliam and mailed at my direction to Ian Craig of the National Stock Exchange of Australia. Also included in Exhibit ML-33 is a true and correct copy (unsigned) of the letter, a signed copy of which was sent to Ian Craig by Gillis and Wishner which explained the financial relationship between NASI and FD, NASI's commitment to fund FD and its financial strength to make the funding as promised.

27. In or about November 2011, I was placed on the payroll of NASI due to the fact that Touchstone Advisors (the company that found the Silverhill shell to do a reverse merger with FD) had requested in October that I cut my salary to $15,000 per month with FD as part of their effort to reduce FD's burn rate and have a better overall financial look to investors as FD just received its final questions from FINRA and the SEC to sell on the OTCBB: stock exchange. I could not afford to work at that new income level and told Wishner and Gillis that I

7

would have to leave FD and seek new alternative employment. Wishner and Gillis agreed that they would put me on NASI's payroll at $23,000 per month plus expenses. While I was on NASI's payroll I did not have access to NASI's CNB bank records. In response to being paid by NASI, I volunteered to modernize NASI's antiquated business procedures, specifically its monthly mailing of checks and Investor Summary Reports to the many NASI investors. In addition I saw the need to generate a full customer excel file of names, addresses, phone numbers and contact information of each investor and coding that investor to what kind of machines he/she had purchased.

28. From July 2013 to August of 2014, I worked on this streamlining and matching of checks and statements written to investors which involved 5 different categories of mailings and statements, all derived from information that was e-mailed to me by Joel Gillis. It took 3 months to generate a complete Excel file for every customer which had to be revised on a weekly basis as old investors and new investors would be added or deleted to the lists. My first proto-type check run was in October of 2013. Before being able to mail checks within the new system, I had to individually code each investor type by (R) (P) (IRA) (SP) (Split). After these investors were coded, they were put into their respective buckets of statements and checks in alphabetical order. That information was sent to Wishner's office so checks could be generated and placed in each type of bucket.

29. Sending out investor checks went as follows: I received the list of current investors from Gillis with their addresses printed with a label format on a spread sheet. I would receive from Wishner's office the checks which had already been written and stamped with Gillis's signature. I would also receive from Gillis the Investor Summary Reports as a computer data transfer. I would take the data for the Investor Summary Reports to Kinkos to print the thousand plus Investor Summary Reports and have them tri-folded. This was a major printing job each month. I would then have the employees under my direction put each investor's check and the same investor's Investor Summary Report (tri-folded) into an envelope and mail the check. This process was repeated for all of the investors. Sometimes we would include notices from Gillis to the investors in the packet of documents mailed to investors. By my efficiency

8

1  we cut the check mailing process down from 2 weeks to a few days with a significant reduction
2  in mistakes - from approximately 130 to 8 mistakes per month. I did such a good job that NASI
3  rewarded me with a nice holiday bonus check in December of 2013. Joel had also told me that,
4  depending on circumstances, he would consider stepping down slowly and have me run NASI
5  with his son-in-law Jeff. This of course made me work even harder and more diligently. I was
6  extremely excited and told my wife as well. We put everything into these companies.

7      30. On or about December 11, 2013 I received an email from Wishner transmitting
8  to me the "Revised Labels" for the current investors in NASI who were supposed to receive
9  checks in the next NASI mailing to be performed by me. The email is attached as Exhibit ML-
10  34. I have only included 1 page out of 72 pages of the names and addresses of the NASI
11  investors because to include the entire list would be too voluminous. If requested I can produce
12  the entire file.

13      31. As noted on Exhibit ML-34, Bribet Services was a NASI investor who I mailed
14  checks to along with the Investor Summary Reports. I understood that Brian Fitzwilliam of
15  CNB was an investor in NASI and he used the business name Bribet Services. The labels for
16  Bribet Services read:

17      Bribet Services
    Attn: Brian Fitzwilliam
18      P.O. Box 1170
    Agoura, Ca. 91376
19

20      32. Attached as Exhibit ML-35 are a few copies of the Investor Summary Reports
21  for Bribet Services that I received from Wishner and Gillis for Bribet Services as part of my job
22  to mail the checks and Investor Summary Reports to the attention of Brian Fitzwilliam for
23  Bribet Services. Attached as Exhibit ML-36 are true and accurate copies of checks payable to
24  Bribet Services that I mailed to the attention of Brian Fitzwilliam along with the Investor
25  Summary Reports. I have possession of these documents.

26      33. On or about January 30, 2014 I was instructed to revise the investor labels to
27  exclude the "C/O" for Bribet Services (which I confirmed with Gillis to mean the removal of
28  Brian Fitzwilliam's name) from the labels we used to mail checks and Investor Summary

9

reports to Bribet Services. I followed my directive and removed Brian Fitzwilliam's name from the computer list. The email directive I received is attached hereto as Exhibit ML-37. The new mailing label for Bribet Services omitting Fitzwilliam's name is attached as Exhibit ML-38 and it identified the addressee as follows:

> Bribet Services
> P.O. Box 1170
> Agoura, Ca. 91376

34. Attached hereto is Exhibit ML-39 are true and correct copies of emails I received or sent containing email exchanges between Fitzwilliam and myself. Certain of these emails demonstrate the familiarity between us, Fitzwilliam's assistance with NASI and FD, and steps Fitzwilliam took to ensure CNB accommodated its depositors' needs.

35. I met Brian Fitzwilliam of CNB soon after arriving at FD in May of 2009. I opened up the FD accounts at CNB which were managed by Fitzwilliam. My own personal accounts were at CNB and managed by Fitzwilliam. My daughter and son opened accounts at CNB as well. I met with Brian Fitzwilliam on a fairly regular basis at CNB. I had his cell phone number and texted him when needed. I received emails from him as reflected above in Exhibit ML-20.

36. From the summer of 2009 onward I frequently ate my breakfast with Gillis and Wishner before work. As a general matter we did not discuss business at breakfast. During a few of these breakfast meetings I overheard conversations between Gillis and Wishner about CNB wanting to see business records of NASI. When this topic of conversation came up, which it did several times over the years, I overheard Gillis asking Wishner in substance- "What did you tell Brian to tell the bank?" Wishner responded to Gillis in substance that – "NASI would not give the bank any of the requested records" and that he "told Brian to tell the bank that NASI was a private company that has passed California State Franchise audits." Further, Wishner said he told the bank substantively, that "if CNB persisted, NASI would move their business elsewhere!" I remember these conversations because they were out of character with our general agreement not to talk about business at breakfast.

37. In late August of 2014, just before the collapse of NASI, I was told by Gillis and Wishner that NASI was being terminated as a depositor at CNB. Wishner told me he had walked into the bank and had a heated argument with Fitzwilliam. When hearing that information I became concerned that my personal accounts and FD's accounts would also be terminated. So I went to CNB to meet with Fitzwilliam to make sure those accounts at CNB were not affected. At this meeting Fitzwilliam looked tired and disheveled. He told me my accounts were safe. When the topic of the termination of NASI's accounts came up in the conversation, I said to Fitzwilliam "I heard that Ed stormed out of here swearing up a storm, how could you do that to them after all these years?" Fitzwilliam said to me "I just couldn't cover for them anymore."

I declare under penalty of perjury under the laws of the state of California that the forgoing statements are true and correct. I executed this declaration in the County of Los Angeles on the date set forth below.

Dated: June 25, 2017

Mark Soffa

