## Declaration of Stoney Wilson

I, Stoney Wilson, declare that I am over 18 and competent to testify. The factual statements set forth below are true, based on my personal knowledge and memory. If I was on the stand in court under oath I would say the same as memory best serves me. This is a statement of how I was motivated to invest in Nationwide Automated Systems, Inc. ("NASI") and how I was fraudulently misled by NASI's two owners and their banker. In preparing this declaration, I reviewed my 2014 written responses to the FBI, Trigild, Inc. (the Receiver), my personal notes, NASI correspondence during and following the investment period and, finally, my own memories.

1.  In late 2011 I first learned of the existence of NASI as a possible investment from my brother James Wilson. He originally heard about NASI from a neighbor that apparently had invested in NASI ATMs. This neighbor had been told sometime before about NASI from an acquaintance in Arizona. I understood that these references were very happy with the investment return. My brother referred me to Joel Gillis at NASI for information and I called him in November or December of 2011. Based on my conversations with him, I learned that NASI supposedly started selling ATMs in 1996. Gillis stated they had been planning to go public, but the key promotor/investor died so they had to back away from going public. Gillis also related: (i) NASI sold ATM machines for $12,000 each and leased them back with rent paid to the owners based on the number of transactions each machine had, with a minimum guaranteed return of 20% annually but "normally the return percentage was 25% plus"; (ii) the rent fee paid to each investor was 50 cents per transaction per machine; (iii) if there were less than 400 monthly machine transactions on average per year, NASI would make up the difference on the 20% guarantee; (iv) if there were more than 400 hits, the investor would participate; and (v) NASI managed over 20,000 machines and owned 2/3s of these machines.

2.  In 2012, I talked further with Joel Gillis and Ed Wisher, partners in NASI. On separate occasions they each told me in depth about their ATM business and assured me the company had never missed an investor payment in 20 years of business. They provided details on the ATM business and industry, and reported that the company's overall financial condition

1

WILSON DECLARATION

was solid. Everything was positive in nature and when I asked about operational problems the replies indicated there were no problems in the business.

3. Gillis told me NASI was "always consistent with payments to investors for many years." Gillis said their model was and "would always be that investors would be secured since they owned and leased back the machines and NASI would own a percentage of its own machines."

4. When I asked Gillis if he would share the privately owned company's financial statements and bank statements with us he declined, instead directing me to contact as a reference their banker Mr. Brian Fitzwilliam, a Senior Vice-President of City National Bank and the general manager of the City National Bank, Woodland Hills branch, where NASI "did all of its banking". Gillis told me that I was free to speak with Brian and gave me his phone number. He added, "Mr. Fitzwilliam will vouch for NASI" and to "ask him anything". Further, Gillis stated that Mr. Fitzwilliam would confirm to me with detail that NASI was a solid investment for me.

5. I took Gillis's offer and spoke to Brian Fitzwilliam at City National Bank. Below is information I received from him. I reviewed notes written by me during my conversation with Fitzwilliam, who specifically stated: (i) NASI had trade accounts with ATM machine companies; (ii) NASI's average bank account balances were $1 to 5 million; and (iii) NASI was with them (the bank) for 15 years.

6. I invested soon after learning of NASI at the end of 2011. During the period I invested, I received rent checks each month from NASI's account at City National Bank. The checks came with Investor Summary Reports accounting for the ATM transactions as reflected in the amount of the check.

7. Wishner told me he was an equal partner with Gillis in NASI. Wishner was very positive about NASI operations and explained his responsibilities as financial, banking, investor accounting and administration.

8. A discrepancy appeared on a financial process sheet for July 2012 having to do with an ATM retail store that was listed in the report in error. When I noticed this on January

6, 2013 I immediately called Wishner. His response was --"he would look into it and get back to me". He did not call so I called again on January 8, 2013 to ask if the error in payment was going to be corrected. He said a make-up check was in the mail and shortly thereafter it was received.

9. The July "Error" bothered me and I, in turn, looked up phone numbers for businesses provided by NASI as ATM sites. I called seven stores and simply asked if they had an ATM for us to use. The results were: Five = Not available, No answer, or No telephone number at all; and, Two = Yes, ATM's on-site.

10. Astonished by this result I immediately called Gillis and confronted him with the results of the inquiry. His immediate response was an angry reply that we (investors) were "never to call their ATM locations." I discounted his reply and demanded answers. He seemed to cool off and then stated that it is not abnormal for machines to be discontinued by store owners, machines may be in process of being replaced or serviced, or, machines might be withdrawn by NASI due to being unprofitable in that location.

11. In January 2012, I took Gillis's suggestion and spoke to Brian Fitzwilliam at City National Bank. We discussed the history of NASI and its relationship with City National Bank. Fitzwilliam reported that NASI was a valued, longtime customer that maintained a "$1 million average balance in the working account".

12. Fitzwilliam said that NASI had been "audited by the IRS and all OK'ed." When I asked why NASI had been audited by the IRS audit he did not provide any clear explanation, but re-stated to me that "the audit went fine".

13. Fitzwilliam reported to me that: (i) NASI had paid its investors consistently for 15 years; (ii) he believed NASI would be a sound and safe investment for me and my family; and (iii) NASI had an investors account with City National Bank with $5,000,000 in it.

14. Fitzwilliam further stated the "bank invested." I was not sure what he meant, but assumed he was saying the bank owned NASI stock, or that because NASI was a good bank customer, the bank had a big interest in it.

///

15. Fitzwilliam stated that his confidence in NASI rested on his close relationship with the principals Gillis and Wishner, as well as his knowledge of NASI's financial standing, operational history, and its good credit record.

16. Fitzwilliam stated he was available to help however he might. It was very important to my wife and I that Fitzwilliam at City National showed such a willingness to help with our due diligence. His impression on us was good and he gave me his direct phone number (818) 227-4328 and told me to call anytime.

17. As a banker and independent source, Fitzwilliam's direct representations of NASI's ATM income and profitability, satisfied customers, length of time in business and annual growth was the main reason I invested in NASI. Gillis and Wishner, as owners, were expected to be overly optimistic. It was primarily Fitzwilliam's positive comments and recommendation upon which I relied.

18. I retained notes which consist mostly of key words and short phases spoken by Fitzwilliam, Gillis, and Wishner during phone calls. These are not readable and as such are not understandable except to me. Much of my statement is from memory triggered by the keywords or phases in my notes.

I, Stoney Wilson, declare under penalty of perjury pursuant to the laws of the State of California that the forgoing is true and correct.

Dated: June 27, 2017              Stoney Wilson (signature on next page)
                                  Stoney Wilson

15. Fitzwilliam stated that his confidence in NASI rested on his close relationship with the principals Gittler and Webber, as well as his knowledge of NASI's financial leverage, operational history, and its good credit record.

16. Fitzwilliam stated he was available to help however he might. It was very important to my wife and I that Fitzwilliam as CEO, Gittler and Webber would agree to help sort out this dilemma. His reassurance to us was punctuated by giving me his cellphone number (c) 916-717-4138 and told me to call anytime.

17. As a banker and independent source, Fitzwilliam's direct representations of NASI's AFor income and profitability, satisfied customers, length of time in business, and annual growth was the main reason I invested in NASI. Gittler and Webber as owners, was expected to be overly optimistic. It was primarily Fitzwilliam's positive comments and recommendation upon which I relied.

18. I retained notes, which consist mostly of key words and short phrases spoken by Fitzwilliam, Gittler and Webber during phone calls. These are not readable and as such are not understandable, except to me. Much of my statement is from memory, triggered by the keywords or phrases in the notes.

I, Stoney Wilson, declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct.

Dated: June 27, 2017

Stoney Wilson